Douglas T. WIGHTMAN, et al.,
Plaintiffs, Appellants,

v.

SPRINGFIELD TERMINAL RAILWAY
COMPANY and United Transportation
Union, Defendants, Appellees.

No. 96–1378.

United States Court of Appeals,
First Circuit.

Heard Oct. 7, 1996.

Decided Nov. 19, 1996.

Harold A. Ross, Cleveland, OH, with whom Ross & Kraushaar Co., L.P.A., Shelley B. Kroll, and Segal, Roitman & Coleman were on brief, for plaintiffs, appellants.

John R. Nadolny, for defendant, appellee Springfield Terminal Railway Co.

Norton N. Newborn, Cleveland, OH, with whom Norton N. Newborn Co., L.P.A., James F. Freeley, Jr., and Freeley & Freeley were on brief, for defendant, appellee United Transportation Union.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Appellants, Brotherhood of Locomotive Engineers and several of its individual members ("BLE") sought to enjoin enactment of a clause in a newly negotiated collective bargaining agreement between Appellees United Transportation Union ("UTU") and Springfield Terminal Railway Co. ("ST"), as a violation of the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151–188. The district court denied the injunction and granted summary judgment for UTU and ST on BLE's complaint. *Wightman v. Springfield Terminal Ry. Co.*, 915 F.Supp. 503, 507 (D.Mass.1996). BLE now appeals.

### *Background*

The RLA governs labor and collective bargaining arrangements between carriers, or employers, and unions. ST is a railroad operator located in Springfield, Massachusetts, and a carrier for purposes of the RLA. BLE and UTU are two of several trade unions who have collective bargaining agreements with ST. The individual plaintiffs in this case belong to BLE.

The RLA authorizes carriers and unions to establish union shops. A union shop in the railroad industry simply means that in order to remain employed with a railroad company, employees must belong to one of the national, RLA recognized railroad unions. *See* 45 U.S.C. §§ 152, Eleventh(a) and (c).[1] ST and the unions with which it maintains collective bargaining agreements have established a union shop.

Employment in the railroad industry revolves around crafts or classes of work, each of which is represented by a different union. Train service and engineer service constitute two such crafts. The former encompasses conductors, brakemen, trainmen and yardmen, and the latter includes primarily locomotive engineers. UTU represents the train service craft and BLE represents the engineer service craft.

By practice, junior engineers advance from the ranks of the train service employees. Over the course of any given year, however, the amount of engineer work may fluctuate. During periods of reduced engineer work, junior engineers may have to return temporarily to train service in order to remain

---

1. 45 U.S.C. § 152 has been drafted in subsections First through Eleventh. Section 152, Eleventh contains subsections a through d. We note the unusual numbering scheme to explain our citation.

employed.[2] Junior engineers, therefore, have an economic interest in maintaining their train service seniority.

Prior to 1995, the UTU–ST collective bargaining agreement allowed non-UTU member engineers to continue to accrue train service seniority. In 1995, however, UTU negotiated a provision known as Article 21, which requires that employees moving from train service to engineer service pay dues to UTU in order to maintain and continue to accrue their train service seniority. When BLE objected to Article 21, ST offered it a similar provision which BLE rejected, apparently believing it to be of little value to its membership.

BLE then challenged Article 21 on RLA grounds. It sought preliminary injunctive relief which the district court denied. Subsequently, on cross motions, the district court granted summary judgment in favor of UTU and ST. This appeal followed.

### Standard of Review

■ We review the award of summary judgment *de novo*. *Ortiz–Pinero v. Rivera–Arroyo*, 84 F.3d 7, 11 (1st Cir.1996). Summary judgment is appropriate in the absence of a genuine issue of material fact, when the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts deriving from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact. *See* Fed.R.Civ.P. 56(c) and (e).

Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se*. *See Wiley v. American Greetings Corp.*, 762 F.2d 139, 141 (1st Cir.1985). Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. *Id.* As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the party

against whom summary judgment has entered. *Den Norske Bank v. First Nat'l Bank of Boston*, 75 F.3d 49, 53 (1st Cir.1996).

### Discussion

BLE raises three basic arguments, each of which involves a different statutory provision of the RLA. First, BLE contends, Article 21 violates the prohibition of mandated dual unionism under 45 U.S.C. § 152, Eleventh(c). Second, BLE urges, Article 21 impermissibly interferes with employees' rights to organize and choose their own collective bargaining representative under 45 U.S.C. §§ 152, Third and Fourth. Finally, BLE asserts, the RLA, 45 U.S.C. § 156, required UTU and ST to provide BLE, an interested party, notice of their contract negotiations and an opportunity to participate in them. We conclude that the district court ably analyzed each of BLE's arguments and properly found them lacking in substance. We affirm.

### A. 45 U.S.C. § 152, Eleventh(c)

■ According to BLE, Article 21 violates 45 U.S.C. § 152, Eleventh(c), part of the union shop provisions of the RLA. Analysis of BLE's argument requires a brief detour into the background of the union shop provisions generally, and how § 152, Eleventh(c) fits into the union shop scheme.

Under 45 U.S.C. § 152, Eleventh(a), carriers and unions may establish union shops. Section 152, Eleventh(a) specifically provides that carriers and unions may "make agreements, requiring as a condition of continued employment, that ... all employees shall become members of the labor organization representing their craft or class." Read in isolation, the plain language of this provision would allow carriers and unions to require employees to belong not to the union of their choice, but to the union certified as the representative of their craft or class.

Organized labor petitioned Congress for the union shop option in order to eradicate the problem of "free riders," railroad employees who do not pay dues to any union but receive whatever benefits collective bargain-

---

**2.** In its reply brief, BLE appears to hint that the ebb and flow of train service employees to and

from engineer service occurs with less regularity today than in prior eras.

ing confers. *See generally Pennsylvania R.R. Co. v. Rychlik*, 352 U.S. 480, 489–94, 77 S.Ct. 421, 426–29, 1 L.Ed.2d 480 (1957). In acceding to labor's request, however, Congress recognized that the intercraft mobility not uncommon in the railroad industry could pose a problem for employees in a union shop. Under § 152, Eleventh(a), an employee shuttling between train service and engineer service could either be forced to change unions or to belong and pay dues to two unions until reaching a level of seniority sufficient to stabilize him as an engineer. As the Supreme Court pointed out, "[t]he former alternative would, of course, be expensive and sometimes impossible, while the latter would be complicated and might mean the loss of seniority and union benefits." *Id.* at 490, 77 S.Ct. at 426.

Congress attempted to tailor union shops to accommodate intercraft mobility through § 152, Eleventh(c). That subsection provides, "[t]he requirement of membership in a labor organization in [a union shop] shall be satisfied ... if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter." 45 U.S.C. § 152, Eleventh(c). On its face, § 152 Eleventh(c) appears to contradict § 152, Eleventh(a) by allowing any employee in any union shop to belong to any of the RLA recognized railroad unions.

The purpose of § 152, Eleventh(c), however, significantly circumscribes its language. *See Rychlik*, 352 U.S. at 488, 492, 77 S.Ct. at 425–26, 427; *see also Landers v. Nat'l R.R. Passenger Corp.*, 814 F.2d 41, 44–45 (1st Cir.1987) (recognizing limited applicability of § 152, Eleventh(c)), *aff'd*, 485 U.S. 652, 108 S.Ct. 1440, 99 L.Ed.2d 745 (1988). Despite its broad language, "the only purpose of Section 2, Eleventh(c) was a very narrow one: to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts." *Landers v. Nat'l R.R. Passengers Corp.*, 485 U.S. 652, 657–58, 108 S.Ct. 1440, 1443, 99 L.Ed.2d 745 (1988); *Rychlik*, 352 U.S. at 492, 77 S.Ct. at 427. Section 152, Eleventh(c) does not exist to benefit unions by permitting them to recruit members from

the ranks of other established unions, or to provide railroad employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility in a union shop. *Rychlik*, 352 U.S. at 493, 77 S.Ct. at 427–28.

Bearing in mind the context and purpose of § 152 Eleventh(c), we turn to BLE's challenge to Article 21. BLE essentially attacks Article 21 from two angles. First, BLE contends, Article 21 constitutes either a § 152, Eleventh(a) union shop agreement that violates § 152, Eleventh(c) or an amendment to the existing ST–UTU agreement that violates § 152, Eleventh(c). Second, BLE argues, Article 21 will upset "the cost sharing scheme which was continued and fostered by the 1951 union shop amendments." We disagree.

On its face, Article 21 can neither constitute a union shop agreement by itself, nor an amendment to the ST–UTU agreement that violates Eleventh(c). Nothing in the language of Article 21 requires membership in UTU or any other union as a condition of employment. *See Brotherhood of Locomotive Eng'rs v. Kansas City Southern Ry. Co.*, 26 F.3d 787, 793 (8th Cir.) (§ 152, Eleventh(c) applies only to a § 152, Eleventh(a) union shop agreement), *cert. denied*, — U.S. ——, 115 S.Ct. 320, 130 L.Ed.2d 281 (1994); *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 838 (7th Cir.) (same), *cert. denied*, — U.S. ——, 115 S.Ct. 82, 130 L.Ed.2d 35 (1994). Article 21 does not require an engineer to choose between dual union membership or unemployment; Article 21 simply requires an engineer to choose whether to retain and continue to accrue seniority in the train service craft. *Wightman*, 915 F.Supp. at 506.

In *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 838 (7th Cir.1994), the Seventh Circuit faced a BLE challenge to a provision requiring engineers desirous of accumulating additional train service seniority to pay dues to UTU. Failure to pay, however, would not affect accrued seniority. In examining whether the provision constituted a union shop agreement, the Seventh Circuit relied in part on the fact that it did

not require payment of dues to UTU in order to retain accrued seniority, implying that such a provision might constitute a union shop provision. *Id.* at 838 (citing *NLRB v. Manitowoc Engineering Co.,* 909 F.2d 963, 969–71 (7th Cir.1990), *cert. denied, Clipper City Lodge No. 516 v. NLRB,* 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991)). Ultimately, the court concluded that the provision at issue did not create any conditions of continued employment, and therefore, did not constitute a § 152, Eleventh(a) union shop agreement. *Id.*

In our view, the extra step Article 21 takes with respect to accrued seniority does not create any conditions on employment different from the provision in *Dempsey.* As indicated, nothing on the face of Article 21 requires employees to belong to UTU in order to remain employed. Despite the fact that Article 21 takes the extra step of conditioning seniority retention and accrual on continued dues payment, an engineer who chooses BLE over UTU satisfies either of the UTU–ST or BLE–ST union shop requirements. To the extent, therefore, that *Dempsey* implies that a provision such as Article 21 might constitute a union shop agreement or amendment, we respectfully disagree.

BLE, however, asserts that engineers who choose BLE over UTU run the risk of unemployment when shuttled back to train service, since they will have no train service seniority. According to BLE, this effectively forces those engineers at the lower end of the engineer seniority list either to belong to UTU and BLE, or to UTU instead of BLE, as a condition of continued employment at ST. BLE asserts that § 152, Eleventh(c) allows a railroad employee in a union shop to change membership to any other RLA recognized union, "without putting himself out of compliance with the membership requirement of a valid union shop agreement and thereby cause a loss of seniority and employment rights." BLE's argument requires us to determine whether § 152, Eleventh(c), in protecting against compulsory dual unionism, elevates seniority into a statutorily protected right employees may take with them as they move from craft to craft and union to union.

By its own language, the RLA governs relations between carriers, unions and employees, and § 152, Eleventh(c) dictates the limits of what carriers and/or unions can demand of employees in a union shop. Within those parameters, which include a prohibition on compulsory dual unionism, the RLA makes no mention of seniority, and notably fails to designate seniority as a protected employment right.

■ In the absence of a legislative pronouncement to the contrary, union contracts typically define the scope and significance of seniority rights. *Aeronautical Indus. Dist. Lodge v. Campbell,* 337 U.S. 521, 526, 69 S.Ct. 1287, 1289–90, 93 L.Ed. 1513 (1949); *Trailmobile Co. v. Whirls,* 331 U.S. 40, 53 n. 21, 67 S.Ct. 982, 988 n. 21, 91 L.Ed. 1328 (1947). Seniority, therefore, does not stem from the employer-employee relationship and by extension become an employment right, but rather from either a statute or the four corners of a collective bargaining agreement, in this case between a union and a carrier. *National Labor Relations Bd. v. Whiting Milk Corp.,* 342 F.2d 8, 10–11 (1st Cir.1965). It is by now well established that in the absence of a contract creating seniority rights, they do not exist. *See Dempsey,* 16 F.3d at 839; *United Food & Commercial Workers Int'l Union, AFL–CIO, Local 7 v. Gold Star Sausage Co.,* 897 F.2d 1022, 1026 (10th Cir.1990); *Cooper v. General Motors Corp.,* 651 F.2d 249, 250 (5th Cir.1981) (citing cases); *Local 1251 Int'l Union of United Auto., Aircraft and Agric. Implement Workers of Am., UAW v. Robertshaw Controls Co.,* 405 F.2d 29, 32–33 (2d Cir.1968) (citing cases) (overruling prior circuit precedent to the contrary).

■ Seniority, like any other benefit deriving exclusively from collective bargaining agreements, does not vest in employees. *Robertshaw,* 405 F.2d at 33; *McMullans v. Kansas, Okla. & Gulf Ry.,* 229 F.2d 50, 53 (10th Cir.1956). Instead, seniority rights are subject to revision or even abrogation with the termination or renegotiation of the collective bargaining agreement.[3] *Dempsey,* 16

---

3. The *Dempsey* opinion ultimately views seniority

as we do, despite that court's implication that a

F.3d at 839; *Robertshaw*, 405 F.2d at 33; *McMullans*, 229 F.2d at 54. Any rights employees have in seniority, therefore, are tied directly to the terms of the labor agreement between the carrier and the union representing their craft. Nothing in the RLA changes this fundamental tenet of labor law.[4] *Dempsey*, 16 F.3d at 840; *McMullans*, 229 F.2d at 53.

We recognize that Article 21 may make it attractive for at least some engineers to choose UTU over BLE. We stop short, however, of equating a union's successful negotiation of a potential competitive advantage over another union with the kind of compulsory dual unionism § 152, Eleventh(c) exists to prevent. *See Whiting Milk*, 342 F.2d at 11 ("Obtaining a benefit for employees may well encourage others to join a union but that side effect does not violate the [NLRB], for 'The truth is that the union is a service agency that probably encourages membership whenever it does its job well.'") (quoting *Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 675–76, 81 S.Ct. 835, 840, 6 L.Ed.2d 11 (1961)). We conclude that § 152, Eleventh(c) does not provide the statutory basis to vest railroad employees with their accrued seniority.

Finally, BLE asserts that Article 21 "upsets the sharing of costs of representation promoted by the 1951 amendments" in violation of § 152, Eleventh(c).

Section 152, Eleventh(c) limits employees in a union shop to membership in those unions which qualify as electors of the union representatives on the National Railroad Adjustment Board ("NRAB"). The NRAB exists to settle disputes arising under collective bargaining agreements. *See Rychlik*, 352 U.S. at 487, 77 S.Ct. at 425. As the Seventh Circuit pointed out, this requirement limits

union shop participation to those unions which share the costs of administering the NRAB, and which "join together in other respects in the negotiating and policing of collective bargaining agreements under the dispute mechanisms of the RLA." *Dempsey*, 16 F.3d at 840. BLE appears to argue that Article 21 has the effect of depriving it of dues that would offset its obligations to NRAB. *See id.* Nothing in the RLA, however, guarantees BLE a particular level of dues to offset its obligations to NRAB. Stated more broadly, the RLA does not protect any one union from competition with another over membership and dues.

### B. 45 U.S.C. §§ 152, Third and Fourth

■ Section 152, Third, entitled "Designation of representatives," provides that neither unions nor carriers "shall in any way interfere with, influence, or coerce the other in its choice of representatives." Section 152, Fourth, dealing with organization and the collective bargaining process, grants employees the right to organize and bargain collectively through representatives of their own choosing, and provides that no carrier may influence or coerce employees regarding their choice of labor organization, nor deduct dues or other fees of such organizations from employee wages. BLE contends that Article 21 violates the employee freedom of choice embodied in Third and Fourth, and also the prohibition on wage deductions in Fourth. Again, we disagree.

In *TWA, Inc. v. Independent Fed. of Flight Attendants*, 489 U.S. 426, 441, 109 S.Ct. 1225, 1234–35, 103 L.Ed.2d 456 (1989), the Supreme Court noted that §§ 152, Third and Fourth operate primarily in pre-certification contexts, where unorganized employees seek to designate representatives and

provision such as Article 21 might constitute a union shop agreement. *See* 16 F.3d at 838–39. *Dempsey* concludes that seniority, born of the collective bargaining agreement, is subject to revision or abrogation. 16 F.3d at 839. We do not interpret *Dempsey*, therefore, as supporting BLE's argument.

4. BLE relies on three cases in support of its contention that Article 21 constitutes an illegal union shop agreement: *Felter v. Southern Pac. Co.*, 359 U.S. 326, 79 S.Ct. 847, 3 L.Ed.2d 854

(1959), *Birkholz v. Dirks*, 391 F.2d 289 (7th Cir. 1968), *vacated as moot*, 395 U.S. 210, 89 S.Ct. 1767, 23 L.Ed.2d 213 (1969) and *O'Connell v. Erie Lackawanna R.R.*, 391 F.2d 156 (2d Cir. 1968), *vacated as moot*, 395 U.S. 210, 89 S.Ct. 1767, 23 L.Ed.2d 213 (1969). BLE asserted these cases unsuccessfully to the Seventh Circuit in support of a nearly identical argument. *See Dempsey*, 16 F.3d at 838 n. 6. We concur in that court's conclusion that these cases are inapposite.

commence collective bargaining with employers. The Court reasoned that the RLA contemplates dispute resolution through private mechanisms, the success of which depends on the independence of the employees' "putative representative" and on neither party's access to the courts to further their own partisan ends. *Id.* (quoting *Switchmen's Union of North America v. National Mediation Bd.,* 320 U.S. 297, 300, 64 S.Ct. 95, 96–97, 88 L.Ed. 61 (1943)). In a post-certification context, by contrast, the parties already have certified representatives and a collective bargaining record in place. In post-certification disputes, therefore, we must limit our intervention to cases in which the aggrieved union has no other remedy "to enforce the statutory commands which Congress had written into the [RLA]." *Id.*

We have concluded that intervention in a post-certification dispute under §§ 152, Third and Fourth will occur in extremely limited circumstances. *See National R.R. Passenger Corp. v. International Ass'n of Machinists and Aerospace Workers,* 915 F.2d 43, 51 (1st Cir.1990). Specifically, we will intervene upon demonstration of carrier conduct reflecting anti-union animus, an attempt to interfere with employee choice of collective bargaining representative, discrimination, or coercion. *Id.* In addition, we will intervene when a carrier commits acts of intimidation that cannot be remedied by administrative means, or commits a fundamental attack on the collective bargaining process or makes a direct attempt to destroy a union. *Id.*

BLE purports to establish a genuine issue of material fact by listing 15 "facts" which it claims demonstrate anti-BLE animus sufficient to justify post-certification judicial intervention. We need not recite all of them here. We agree with the district court that BLE's facts, even if all true, at best demonstrate sharp bargaining practices between unions in an effort to gain competitive advantage. *Wightman,* 915 F.Supp. at 507. While

BLE's facts evince competitive jockeying between it and UTU, they notably fail to demonstrate anti-BLE animus or a fundamental attack on the bargaining process by ST.[5] Accordingly, the District Court correctly declined to intervene in this post-certification matter.

BLE also contends that Article 21 violates §§ 152, Third and Fourth as a matter of law.[6] BLE offers precedent under the National Labor Relations Act ("NLRA"), which it seeks to apply analogically to this railroad dispute. While the NLRA may provide analogies that bear on interpretation of the RLA, the Supreme Court has emphasized that "the NLRA 'cannot be imported wholesale into the railway labor arena.'" *TWA,* 489 U.S. at 439, 109 S.Ct. at 1233 (quoting *Brotherhood of R.R. Trainmen v. Jacksonville Terminal,* 394 U.S. 369, 383, 89 S.Ct. 1109, 1118, 22 L.Ed.2d 344 (1969)). We especially hesitate to employ NLRA precedent in light of the clear and unequivocal RLA precedent from the Supreme Court, this circuit and others, which underscores the limited post-certification application of §§ 152, Third and Fourth. *See TWA,* 489 U.S. at 441, 109 S.Ct. at 1234–35 (limiting application of §§ 152, Third and Fourth to pre-certification contexts); *Nat'l R.R. Passenger,* 915 F.2d at 51 (same); *see also Kansas City Southern,* 26 F.3d at 795; *Dempsey,* 16 F.3d at 841.

Finally, BLE argues somewhat opaquely that a wage deduction provision only passes RLA muster if it comprises part of a union shop agreement under § 152, Eleventh. At the outset we note that Article 21 by itself does not refer to wage deductions, much less mandate them. Assuming such a wage deduction exists, however, we disagree with BLE's interpretation of §§ 152, Fourth and Eleventh(b).

As indicated, § 152, Fourth provides that carriers may not deduct union dues or fees from employee wages. Section 152, Elev-

---

**5.** To be sure, it does not appear that ST was entirely candid with BLE regarding its negotiations with UTU and the substance of the ST–UTU agreement. The RLA, however, does not compel ST to inform BLE of the substance of negotiations with a third union, and we do not identify anti-BLE animus in ST's actions.

**6.** BLE essentially argues that by making it so attractive for engineers to join UTU, Article 21 has the effect of impermissibly interfering with their free choice of union, and coercing them to join UTU, in violation of §§ 152, Third and Fourth.

enth(b), however, provides that carriers and labor organizations may make agreements providing for the deduction of "any periodic dues, initiation fees, and assessments" from employee wages as long as the employee has given the carrier written permission. 45 U.S.C. § 152, Eleventh(b). Section 152, Eleventh(b), unlike Eleventh(c), does not limit its applicability to Eleventh(a), or union shop agreement situations. *See Kansas City Southern*, 26 F.3d. at 794. Read together, §§ 152, Fourth and Eleventh(b) provide that carriers may not unilaterally deduct dues from employee wages, but may do so upon the agreement of all parties involved. *See id.* Thus, even in the absence of a union shop agreement, employees and carriers may agree to a dues deduction schedule under § 152, Eleventh(b).

### C. 45 U.S.C. § 156, Bargainable Interest

■ BLE contends that the District Court erred in not setting Article 21 aside on the basis that UTU and ST failed to notify BLE of their negotiations, and afford BLE the opportunity to participate in them.

The RLA mandates that "[c]arriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions" to interested parties. 45 U.S.C. § 156. BLE identifies itself as an interested party, and contends that ST or UTU owed it notice. BLE also contends that it has joint jurisdiction over collective bargaining between ST and UTU, at least with respect to train service seniority, by dint of the routine shuttling of employees between the train service and engineer service crafts. According to BLE, that joint jurisdiction should have given it an opportunity to participate in the negotiations.

The Eighth Circuit recently faced BLE's argument and concluded that neither the carrier nor UTU had any statutory obligation to provide BLE with notice or the opportunity to participate in negotiations, a conclusion with which we substantially agree. *See Kansas City Southern*, 26 F.3d at 792. 45 U.S.C. § 156 exists to prevent either a carrier or union from unilaterally changing the terms of the operative collective bargaining agree-

ment. *Order of Railway Conductors and Brakemen v. Switchmen's Union of N. Am.*, 269 F.2d 726, 733 (5th Cir.), *cert. denied*, 361 U.S. 899, 80 S.Ct. 206, 4 L.Ed.2d 155 (1959). Section 156, therefore, furthers the overall purpose of the RLA to permit employees to choose their own bargaining representative freely, and to ensure a procedure for "the commencement of conferences between representatives of the two parties if changes are to be made in the contract." *McMullans*, 229 F.2d at 56. Section 156 does not exist to open collective bargaining negotiations between a carrier and a union to any other union claiming an interest.

BLE relies chiefly on two cases, neither of which compel the conclusion BLE seeks. The first, *Brotherhood of Locomotive Firemen and Enginemen v. National Mediation Board*, 410 F.2d 1025, 1030 (D.C.Cir.), *cert. denied*, 396 U.S. 878, 90 S.Ct. 149, 24 L.Ed.2d 136 (1969), involved a dispute between BLE and the firemen's union over apprentice engineers, a new class of railroad employees. The court determined that in the absence of a certified representative for the new class, any union that could fairly claim representation over the apprentices could legitimately bargain with the carrier about the terms and conditions of the apprentices' employment. *Id.* By demonstrating a fair claim of representation, therefore, a union established a right to notice and the opportunity to participate under the RLA. *Id.*

This case, by contrast, involves collective bargaining between a represented class of employees and their carrier. BLE does not assert any claim of representation over UTU members, nor could it. Train service employees have already certified UTU as their bargaining representative. *National Mediation Board*, therefore, does not support BLE's asserted interest in the negotiations that produced Article 21.

BLE also relies on *Illinois Cent. R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 443 F.2d 136, 138, (7th Cir.1971). The dispute in *Illinois Central* involved a tripartite agreement between the carrier, BLE and UTU governing the list of train service employees eligible for engineer work. UTU filed suit

**236**

when BLE sought to negotiate revisions to the rules governing the list without providing UTU notice and an opportunity to participate. The court, noting the tripartite agreement, determined that UTU and BLE shared joint negotiating interests over the list, and therefore, that BLE could not unilaterally negotiate rule revisions with the carrier. *Id.* at 141.

Obviously no formal tripartite agreement exists in this case. BLE, however, points to language in *Illinois Central* indicating that even in the absence of such an agreement, the ebb and flow of employees between the two crafts would give the firemen an "important economic stake in the rules regulating the extra list" which in turn would establish a bargainable interest in UTU over rules governing the list. *Id.* at 141–42. BLE argues that the same ebb and flow vests it with a bargainable interest in the negotiation of train service seniority.

We disagree with BLE's interpretation of *Illinois Central.* First, that case revolved around a list outside of either UTU's or BLE's collective bargaining agreements with the carrier. The rules governing the extra list, moreover, placed direct conditions on a fireman's employment—they dictated which of the firemen could also engage in engineer work. BLE's assumption of sole negotiating responsibility over rules governing the list placed BLE in the position of representing firemen even though the firemen had certified UTU as their collective bargaining agent.

In this case, by contrast, UTU does not seek to unilaterally govern the ebb and flow itself. UTU, through Article 21, has simply negotiated with ST the mechanism through which train service employees accrue seniority, as part of negotiations over a general collective bargaining agreement. BLE and UTU have no tripartite agreement, nor is UTU attempting to unilaterally negotiate a set of rules governing movement between the two crafts.

As the Eighth Circuit concluded,
"[t]he distinctive division of railroad employees under the RLA into crafts or classes, and the regular movement of employees among the crafts that is character-

istic of the industry, portends overlapping 'interests' among bargaining units in the composition of the crafts and in their labor agreements. That sort of interest, however, does not confer upon all unions the right to notice and participation in the arbitrations of all other unions."

*Kansas City Southern,* 26 F.3d at 791–92. We conclude that the RLA does not provide BLE with a bargainable interest in Article 21 such that ST and UTU owed BLE notice and an opportunity to participate in the negotiations.

***Affirmed.***