Marvin Edward CORZINE, James Phillip Herndon, and United Transportation Union, Plaintiffs,

v.

BROTHERHOOD OF LOCOMOTIVE ENGINEERS and Illinois Central Railroad Company, Defendants.

No. 97 C 4337.

United States District Court,
N.D. Illinois,
Eastern Division.

Oct. 23, 1997.

---

Clinton J. Miller, III, United Transp. Union, Cleveland, OH, Stephen Allen Murphy, Chicago, IL, for Plaintiff.

William Liasson Phillips, William L. Phillips, Chicago, IL, Harold A. Ross, Ross & Kraushaar, Cleveland, OH, for Brotherhood of Locomotive Engineers.

Ronald A. Lane, Illinois Central R. Co., Chicago, IL, Edward Nathan Druck, Franczek, Sullivan, Mann, Crement, Hein, Relias, P.C., Chicago, IL, for Illinois Central R. Co.

## MEMORANDUM OPINION AND ORDER

MAROVICH, District Judge.

Plaintiffs Marvin Edward Corzine ("Corzine"), James Phillip Herndon ("Herndon") and United Transportation Union (collectively "UTU") filed a complaint, against Defendants Brotherhood of Locomotive Engineers ("BLE") and Illinois Central Railroad Company ("IC") alleging that Article 9 of the May 27, 1997 Agreement between BLE and IC (the "Agreement") violates the Railway Labor Act ("RLA"), 45 U.S.C. § 151, *et seq.* Specifically, UTU contends that the Agreement constitutes a breach of the duty of fair representation required by Section 2 Fourth of the RLA, 45 U.S.C. § 152 Fourth, and a direct violation of Section 2 Eleventh(c) of the RLA, 45 U.S.C. § 152 Eleventh(c). The parties have filed cross-motions for summary judgment. For the reasons set forth below,

the Court grants BLE's and IC's motions for summary judgment and denies UTU's motion for summary judgment.

## BACKGROUND

IC is an interstate railway carrier within the meaning of Section 1 of the RLA. Like most railroads, IC has collective bargaining agreements with different unions which represent various categories, or "crafts," of train service employees. UTU and BLE are national labor organizations, organized pursuant to the RLA, representing employees in engine (engineer) and train (conductor, brakemen, yard) service. UTU is the exclusive bargaining representative for the train service craft, which includes IC's conductors, brakemen, and switchmen. BLE is the exclusive bargaining representative for the engine service craft, which includes IC's locomotive engineers. Corzine and Herndon are presently employed as engineers by IC. Both employees have seniority as locomotive engineers and are members of UTU, but not of BLE.

The parties and subject matter of this case are not unfamiliar to this Court. The litigation between UTU and BLE, at least so far as this particular action is concerned, began in 1992 when UTU began including provisions for seniority maintenance fees in its collective bargaining agreements with various railroads. See Carr v. Chicago, Central & Pacific R.R., 853 F.Supp. 282 (N.D.Ill. 1994). At the time, UTU was experiencing what it characterized as an accelerated transfer of train service employees into engineer positions. This exodus led to increasing expenditures by UTU to protect the seniority of its members who were working outside of the craft. In some cases, according to UTU, more than a quarter of its members were working outside of the train service craft and "free riding" on UTU's efforts to negotiate and administer its collective bargaining agreements. To alleviate this drain, UTU engaged in several "side letter" agreements

with various railroads which required train service employees who were working outside of the craft to pay a "seniority maintenance fee" to continue to accumulate, and in some cases retain, train service seniority.

BLE brought suit in several federal courts, including this one, claiming that the agreements violated various provisions of the RLA, particularly Sections 2, Eleventh(c) and 2, Fourth, by requiring employees to pay a fee or dues to UTU to continue to accrue seniority and effectively forcing them to join more than one union or change to UTU membership. BLE's challenges to the UTU seniority fees ultimately proved unsuccessful. Consequently, BLE elected to respond to UTU's "out of craft" seniority fees by imposing seniority fees of its own on UTU's members. Although the matter is therefore resolved as to the legality of UTU's seniority fees, the parties have nevertheless returned to federal court, albeit on opposite ends of the caption, and prevail upon this Court to consider the legality of *BLE's* seniority fees and to answer the age old question: Is what's good for the goose also good for the gander?

This action is almost identical to the earlier federal actions brought by UTU with a single exception: Article 9 of BLE's 1997 agreement with IC creates seniority fees not only for those employees who are working outside of the engineer craft, but also for employees from train service who are presently working *inside* the engineer craft.[1] Thus, UTU's members cannot continue to accumulate engineer seniority while working in the engineer craft unless they elect to pay a seniority fee to BLE. UTU contends that such "in craft" seniority fees violate the RLA even though "out of craft" fees do not.

## DISCUSSION

### I. Standards for Summary Judgment

All of the parties have presented the Court with motions for summary judgment. Sum-

---

1. Article 9, section 1(a) requires engineers who transfer to train service to pay a seniority maintenance and accrual fee to BLE to preserve their engineer seniority while they are working outside the craft. This section is not disputed by the parties. Hereafter, when discussing Article 9, the Court is referring to Section 1(b), the provision which is actually in dispute.

Article 9, section 1(b) provides that: a service fee will be required of engineers transferring from train service who do not hold membership in the BLE in order to defray the cost of negotiating and administering the collective bargaining agreement governing their rates of pay, rules and working conditions and for the maintenance and accumulation of engineers' seniority.

mary judgment is appropriate where the pleadings, answers to interrogatories, admissions, affidavits, and other materials show that there is "no genuine issue as to any material fact" and that, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Only genuine disputes over "material facts" can prevent a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). When considering a motion for summary judgment, the Court must view the facts, and all inferences drawn from the facts, in the light most favorable to the nonmovant. *Griffin v. Thomas,* 929 F.2d 1210, 1212 (7th Cir.1991); *Roman v. U.S. Postal Serv.,* 821 F.2d 382, 385 (7th Cir.1987). Because the parties have filed cross-motions, the Court must extend the required favorable inferences to each when viewing the other's motion. *Andersen v. Chrysler Corp.,* 99 F.3d 846, 856 (7th Cir. 1996). The parties are in essential agreement as to the facts, therefore the question is whether any of them is entitled to judgment as a matter of law. Fed. P. Civ P. 56; *McCarthy v. Kemper Life Ins. Cos.,* 924 F.2d 683, 687 (7th Cir.1991).

## II. *Dual Unionism and Section 2, Eleventh(c)*

In an effort to ensure that all railroad employees would be compelled to share in the costs of union representation—thus avoiding the perceived problem of "free riders" Congress added Section 2, Eleventh(a) to the RLA in 1951.[2] *See Ellis v. Brotherhood of Ry., Airline & S.S. Clerks,* 466 U.S. 435, 446, 104 S.Ct. 1883, 1891, 80 L.Ed.2d 428 (1984). Under Section 2, Eleventh(a), a union and a railroad may enter into an agreement that requires, "as a condition of continued employment," that all employees in

certain crafts join one of the RLA recognized railway unions representing their craft or class. 45 U.S.C. § 152 Eleventh(a). These are commonly referred to as "union shop" agreements. The union shop provision as drafted in Section 2, Eleventh(a), however, posed distinct problems in the railroad industry where employees often shuttled back and forth between different crafts—train service and engineer service. Under Section 2, Eleventh(a), however, an employee shuttling between services might be forced to constantly change unions or to pay dues to two unions until reaching a level of seniority where he could remain in only one service.

In recognition of this dilemma, Congress attempted to tailor the RLA to accommodate intercraft mobility in Section 2, Eleventh(c).[3] That subsection modified the RLA's union shop provision to protect against the possibility that an employee could lose his or her job for failure to join multiple unions among the operating crafts. Specifically, Section 2, Eleventh(c) provides, "[t]he requirement of membership in a labor organization [pursuant to a union shop agreement] shall be satisfied ... if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter." 45 U.S.C. § 152, Eleventh(c). The Supreme Court explained that "the only purpose of Section 2, Eleventh(c) was a very narrow one: to prevent compulsory dual unionism or the necessity of changing from one union to another when an employee temporarily changes crafts." *Landers v. Nat'l R.R. Passengers Corp.,* 485 U.S. 652, 657–58, 108 S.Ct. 1440, 1443, 99 L.Ed.2d 745 (1988). Thus, Section 2, Eleventh(c) would, for example, allow a UTU member to move from train service to

---

2. Railway Labor Act Section 2, Eleventh(a), 45 U.S.C. § 152 Eleventh(a), provides in relevant part:

 [A]ny carrier or carriers ... and a labor organization or labor organizations ... shall be permitted—(a) to make agreements, requiring, as a condition of continued employment, that within sixty days following the beginning of such employment, or the effective date of such agreements, whichever is the later, all employees shall become members of the labor organization representing their craft or class....

3. Railway Labor Act Section 2, Eleventh(c), 45 U.S.C. § 152 Eleventh(c), provides in pertinent part:

 The requirement of membership in a labor organization in an agreement made pursuant to subparagraph (a) of this paragraph shall be satisfied, as to both a present or future employee engaged in engine, train, yard, or hostling service ... if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter and admitting to membership employees of a craft or class in any of said services....

engineer service without being forced to change his union membership to BLE.[4]

UTU argues that Article 9, Section 1(b) of the Agreement between BLE and IC violates Section 2, Eleventh(c) of the RLA by requiring employees who are working as engineers to pay membership dues or the equivalent to BLE if they want to continue to maintain and accrue seniority as engineers. UTU insists that because all jobs are bid for, assigned and held on the basis of seniority, Article 9 effectively forces those engineers who are UTU members to join two unions or change their membership to BLE—thus, vitiating the "safe harbor" established by Section 2, Eleventh(c) to protect employees against compulsory dual unionism, *i.e.*, being forced to join more than one union.

■ UTU recognizes, however, that in order to avoid putting "the proverbial cart before the horse," the Court must first determine whether Article 9 constitutes a union shop agreement made pursuant to Section 2, Eleventh(a). *See Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 838 (7th Cir.1994). The Seventh Circuit explained:

> Section 2, Eleventh(c) is only a limitation on Section 2, Eleventh(a)'s general authorization of the union shop under the RLA. In other words, the prohibitions against dual unionism contained in Section 2, Eleventh(c) only kick in when the agreement at hand purports to be a union shop agreement made pursuant to Section 2, Eleventh(a).

*Id.* Hence, the first question presented to the Court—the "horse" in this case—is whether Article 9 is a union shop agreement that requires, as "a condition of continued employment," that engineers pay seniority fees to BLE. *Id.*

UTU argues that Article 9 creates a de facto condition of employment because all engineer jobs are bid for, assigned and held on the basis of seniority. When engineer positions are in short supply, the employees who have the least seniority as engineers are the first to be let go or transferred back to train service. UTU contends that Article 9

effectively forces engineers who are UTU members to join a second union or drop their UTU membership to retain their seniority, and hence their jobs, as engineers. As stated above, this is not the first time that seniority accumulation or retention fees, similar to those contemplated in Article 9, have been considered by the courts. UTU acknowledges that—as a result of its own advocacy—comparable agreements have been upheld by federal courts across the country including this Court. *See Dempsey*, 16 F.3d at 838; *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 232 (1st Cir.1996); *Brotherhood of Locomotive Engineers v. Kansas City Southern Ry. Co.*, 26 F.3d 787, 793 (8th Cir.1994); *Carr*, 853 F.Supp. at 286.

■ By now it is well settled that, absent a statutory provision to the contrary, seniority rights arise out of the collective bargaining agreement negotiated between the employer and the craft representative. *Dempsey*, 16 F.3d at 839 (citing *Aeronautical Indus. Dist. Lodge 727 v. Campbell*, 337 U.S. 521, 69 S.Ct. 1287, 93 L.Ed. 1513 (1949)); *Wightman*, 100 F.3d at 232. In this context, courts have held that various forms of seniority accumulation and retention agreements between UTU and the railroads do not constitute union shop agreements, and therefore do not fall within the scope of Section 2, Eleventh. Specifically, these courts have noted that "the RLA makes no mention of seniority, and notably fails to designate seniority as a protected employment right." *Wightman*, 100 F.3d at 232. As this Court has previously observed, "[t]o put it simply, seniority is not derived from union membership; rather it is a right derived from and limited by the collective bargaining agreement." *Carr*, 853 F.Supp. at 287. Thus, seniority, like every entitlement established through a collective bargaining agreement, 25 subject to modification or expiration. *Dempsey*, 16 F.3d at 839; *see also McMullans v. Kansas, Oklahoma and Gulf Ry. Co.*, 229 F.2d 50, 53 (10th Cir.1956) ("those who acquired seniority rights under a contract are bound by the possibility that; the contract may be changed, and the rights thereunder revised or abrogated"); *Colbert*

4. For a more detailed discussion of the legislative history leading up to the enactment of Section 2, Eleventh(c), see Justice Harlan's discussion in

*Pennsylvania Railway Co. v. Rychlik*, 352 U.S. 480, 77 S.Ct. 421, 1 L.Ed.2d 480 (1957).

*v. Brotherhood of R. R. Trainmen,* 206 F.2d 9, 13 (9th Cir.1953) ("[s]eniority among railway workers is fundamentally and wholly contractual and it does not arise from mere employment and is not an inherent, natural or constitutional right"). The RLA does not guarantee employment for life, nor do employees have a vested right in the seniority created by collective bargaining agreements between the union and the railroad.[5] *Dempsey,* 16 F.3d at 839–40. Accordingly, because article 9 does not create any conditions of continued employment, it is not a union shop agreement pursuant to Section 2, Eleventh(a) and therefore does not violate—or even fall within the scope of—Section 2, Eleventh(c).

Undeterred, UTU insists that the seniority accumulation/retention agreements that it has so valiantly championed through the federal courts over the past several years are different from BLE's Article 9 accumulation/retention agreement. Apart from the fact that it is BLE's agreement that is at issue in this case—a fact this Court believes is very significant to UTU's position—UTU contends that the prior agreements only operated when the employees were not employed—or "out of service"—in the craft for which they wanted to maintain or accumulate seniority. For example, UTU's seniority fees only applied to BLE members who wanted to maintain or accumulate train service seniority while working "outside" the train service as engineers. In contrast, Article 9 requires UTU's members to pay BLE's seniority fees even while they are "in service" working as engineers if they want to maintain or accumulate engine service seniority. The Court, however, finds this to be a distinction without a difference. UTU fails to establish how this in service/out-of-service distinction affects whether or not Article 9 requires union membership "as a condition for continued employment.."

Nothing on the face of Article 9 requires that engineers pay fees to BLE as a "condition of continued employment." Article 9 only conditions maintenance and accumulation of *seniority* on payment of fees to BLE. Employees who refuse to pay the fees adopted by Article 9 will not accrue engineer seniority, but they will not be terminated from their engineer positions for failure to do so. They can continue to *work* as engineers while positions are available for those with no seniority. When engineer positions become scarce, the employees may return to train service where they will have continued to accrue seniority as UTU members and can return as engineers when those positions become available again.[6] If engineers do not wish to pay the fee, they may still satisfy the union shop agreement as members of UTU. Article 9 does not contain any language which indicates that failure to pay the fees will automatically result in the termination of the employees from the engineer craft. *See Dempsey,* 16 F.3d at 838; *Wightman* 100 F.3d at 231; *Kansas City Southern,* 26 F.3d at 793; *Carr,* 853 F.Supp. at 286.

The mere possibility that an employee may face a transfer back to train service in the future does not render seniority fees a condition of continued employment. *Dempsey,* 16 F.3d at 840; *Carr,* 853 F.Supp. at 287. Although Article 9 may make membership in one union more or less desirable than another, this does not constitute a condition of continued employment. *Dempsey,* 16 F.3d at

---

**5.** Pursuant to these principles, courts have consistently found that seniority maintenance agreements do not create de facto conditions of employment; whether limitations are imposed on the continued accrual of seniority, *Dempsey,* 16 F.3d at 839–40; *Kansas City Southern,* 26 F.3d at 793, or the maintenance of already accrued seniority. *Wightman,* 100 F.3d at 233; *Carr,* 853 F.Supp. at 287.

**6.** In fact, to the extent that this type of temporary craft shifting is addressed by Section 2 Eleventh, it is only to facilitate the continued switching of positions without the need to join a second union. No mention is made of the "right" of employees to secure a permanent place in the temporary craft or retain seniority in that craft once they are transferred back out. *See Rychlik,* 352 U.S. at 490–92, 77 S.Ct. at 426–27 (1957):

> Thus a fireman may be promoted to a position as engineer for a short time and then due to a reduction in force be returned to his former position as fireman. It is the intention of this proviso to assure that in the case of such promotion or demotion ... the employee involved shall not be deprived of his employment because of his failure or refusal to join the union representing the craft or class in which he is located if he retains his membership in the union representing the craft or class from which he has been transferred.

840. Employees may find it advantageous to accrue seniority in two crafts while they are only working in one, however "succumbing to [the] temptation to obtain a benefit that increases employment security is not the same as being forced to do so as a condition of continued employment." *Carr*, 853 F.Supp. at 287. In short, this Court finds that Article 9, as a matter of law, does not violate Section 2 Eleventh(c) of the RLA by requiring union membership as a condition of continued employment.

### III. *The Duty of Fair Representation and Section 2, Fourth*

 UTU argues that even if Article 9 is not an illegal union shop agreement under Section 2, Eleventh(c), it nevertheless constitutes a breach of BLE's duty of fair representation as the duly designated representative of all employees within the engineering craft under Section 2, Fourth. Section 2, Fourth of the Railway Labor Act, 45 U.S.C. § 152, Fourth, does not expressly create a duty of fair representation on the part of a union; however, it is by now well established that such a duty does exist. *Steele v. Louisville & N.R. Co.* 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944); *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citing additional cases); *Wells v. Order of Ry. Conductors and Brakemen*, 442 F.2d 1176 (7th Cir.1971); *Rakestraw v. United Airlines, Inc.*, 981 F.2d 1524 (7th Cir.1992). Unions which assume the position of statutory craft representative under the RLA also assume the duty to fairly represent all members of the craft (not just those who are also union members) "without hostile discrimination, fairly, impartially, and in good faith." *Steele*, 323 U.S. at 204, 65 S.Ct. at 233. This duty applies not only to the administration of collective bargaining agreements, but also to their negotiation. *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991).

 A union breaches its duty of fair representation if its actions are "arbitrary, discriminatory, or in bad faith." *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Rakestraw*, 981 F.2d at 1530. A collective bargaining agreement which is allegedly negotiated for a "bad faith" reason is not a breach of the duty of fair representation so long as the agreement "rationally serves the interests of workers as a whole, and ... treats employees who are pariahs in the union's eyes no worse than it treats similarly situated supporters of the union." *Rakestraw*, 981 F.2d at 1535. In the absence of overt bad faith action on the part of the union, the Court's inquiry must then focus on the "arbitrary nature" of the action. The Supreme Court has explained that "a union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' ... as to be irrational." *Air Line Pilots Ass'n*, 499 U.S. at 67, 111 S.Ct. at 1130. Negotiations will always have winners and losers, this does not necessarily mean that a union has bargained in bad faith or acted in an irrational manner. *Rakestraw*, 981 F.2d at 1530–31.

Here, UTU asserts that BLE has "directly and knowingly" breached its duty of fair representation by requiring those employed in the BLE represented craft of engineering to pay a fee to BLE in order to maintain and accumulate their seniority. UTU claims that because BLE members do not have to pay this seniority fee, the fee impermissibly allocates seniority on the basis of union membership. *See Jones v. Trans World Airlines*, 495 F.2d 790, 797 (2d Cir.1974). BLE responds that Article 9 is supported by a number of legitimate, rational considerations. Namely, that of requiring all engineers to pay their "fair share" of the costs of representation and defray the costs of maintaining seniority.[7]

---

7. BLE relies on the affidavit of its General Chairman, J.L. Koonce. Koonce explains that since 1986, train service employees have been the preferred source of new engineers and that UTU's successful effort to institute out of craft seniority fees has limited the number of new engineers who support BLE financially. Koonce states that BLE has incurred substantial expenses associated with negotiating collective bargaining con-

tracts for all engineers, not just BLE members, and that Article 9 was negotiated in response to:

"the concern of all engineers, whether usually working as engineers or working as train service employees, that all who enjoy the benefit of the rates of pay, rules, working conditions and fringe benefits contained in GAC's agreements, or enjoy the aggressive representation

BLE also contends that the seniority accumulation agreement provided for in Article 9 does not arbitrarily allocate seniority to engineers based upon "union membership." All engineers desiring to accumulate additional engineers' seniority must pay the fee. For BLE members, this fee is reflected in their union dues, while for UTU members it is reflected in a service fee. An engineer who wishes to remain a member of UTU may continue to accrue seniority as an engineer by paying a seniority fee to BLE. While the amount of that fee is capped by the cost of the dues paid by BLE members, the seniority fee is not the factual or legal equivalent of BLE membership and does not subject the engineer to BLE's constitution and bylaws.

This Court cannot help but feel a sense of "deja vu all over again." It was only a few years ago that UTU was before this Court arguing that its own retention agreement was necessary to ensure that train service employees would pay "fair support" to UTU to protect the train service seniority of employees working outside the craft. *Carr*, 853 F.Supp. at 288. UTU maintains that its own seniority retention agreements related to a preservation of train service seniority for those persons "outside" the UTU represented crafts, while BLE's agreement applies to persons inside the craft. Nevertheless, UTU has once again failed to provide the Court with any sound rationale as to why BLE may not apply the same "fair support" reasoning to support its own seniority fees for employees working inside the craft, especially when there is no evidence to suggest that the "fair support" required by UTU for maintaining seniority outside the craft was any higher than BLE's costs for maintaining seniority inside the craft.[8]

Finally, UTU maintains that there is a genuine issue of material fact in dispute with respect to BLE's motivation for including Article 9 in its Agreement with IC. UTU points to the Second Declaration of J.L. Batton, UTU's General Chairman, as evidence of bad faith on the part of BLE. With respect to BLE's motivation for including Article 9 in the Agreement, however, Batton's declaration consists of little more than his assertion that he "has no doubt from [his] own observations on the property that animosity and hostility toward UTU and its members is at the root of article 9 of the BLE–IC agreement," and that Article 9 "is obviously just another form of intimidation to influence UTU engineers to join the BLE." UTU fails to point the Court to any evidence that justifies an inference of bad faith on the part of BLE.[9] And Batton's unsupported suppositions standing alone are insufficient to create a genuine issue of material fact which would defeat summary judgment. *See Dempsey*, 16 F.3d at 842 (citing *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir.1985)). In sum, this Court is convinced that UTU's facts do not evidence anti-UTU animus and "at best demonstrate sharp bargaining practices between unions in an effort to gain competitive advantage." *See Wightman*, 100 F.3d at 234.

## CONCLUSION

For the foregoing reason, the Court grants the IC and BLE's motions for summary judgment and denies the UTU's motion for summary judgment.

---

of GCA in handling their claims, grievance and disciplinary matters, or enjoy the benefit of continuous locomotive engineer seniority, would share in the financial support of GCA...."

8. So far as the Court can determine, the only reason that UTU has not adopted a similar "in craft seniority fee" is because engineers do not frequently transfer out of the engineer service to the train due to the elimination of certain train service positions and separation of train service positions through buyouts. *See Dempsey*, 16 F.3d at 834. In other words, the imposition of such a fee would be impracticable.

9. UTU has also failed to provide the Court with any factual basis to support its claim that IC acted in bad faith or arbitrarily. In fact, UTU admits that it has no information at all about IC's motivation. *See* Plaintiffs' Combined Response to Statements Of Undisputed Facts ¶ 16.