**ROGER WILLIAMS UNIVERSITY FACULTY ASSOCIATION (RWUFA/NEA), Plaintiff,**

v.

**ROGER WILLIAMS UNIVERSITY, Defendant.**

**C.A. No. 13–16L.**

United States District Court, D. Rhode Island.

Signed April 23, 2014.

Carly B. Iafrate, Providence, RI, for Plaintiff.

Jillian S. Folger–Hartwell, Walter C. Hunter, Littler Mendelson, P.C., Providence, RI, for Defendant.

## MEMORANDUM AND DECISION

RONALD R. LAGUEUX, Senior District Judge.

This matter is before the Court on cross motions for summary judgment brought to resolve the appeal of Plaintiff Roger Williams University Faculty Association ("the Union") from an arbitration award. The arbitration award ("the Award") held that the Union's complaint was not arbitrable under the collective bargaining agreement with Defendant Roger Williams University ("the University"). For reasons explained herein, the Court upholds the Award. The Court also rules that the Union's retaliation claim, which the Union argues had been reserved, was waived by the Union.

### Background

The grievance underlying this action was brought by longtime tenured graphics design professor Sharon DeLucca. DeLucca filed a grievance in 2010, stemming from her conviction that she was performing the role of chair of the graphic design department while not receiving the title, recognition and compensation that should accompany this position. In fact, graphic design is not an independent department at the University; instead it is part of the Communications department, with its own dean and department chair.

Co-workers testified that before and after 2010 DeLucca had tried to exercise the authority consistent with a department chair role, although that conduct had caused friction with her colleagues and the dean in the communications department. In addition, several students had complained about DeLucca's behavior in class—characterized by mercilessly criticizing some, while exhibiting favoritism towards others. Moreover, she frequently cancelled classes without arranging make-

ups, and failed to appear for her scheduled office hours.

These and many other negative reports accumulated and, on April 6, 2011, Pamelee Murphy, the University's assistant general counsel for labor and employment, wrote to DeLucca stating that the University had received a number of complaints and intended to initiate an investigation into her conduct. The letter referenced no specific complainant by name, stating the following allegations in general terms:

> It has been alleged that, for some time now you have engaged in a pattern of conduct that is experienced by both faculty and staff as verbally abusive, demeaning, intimidating, bullying, and/or negligent and inappropriate to the work place. Our investigation to date reveals that this contended behavior is disruptive to the work place and interferes with the ability of other employees to perform their duties and, relative to student focus, is negligent if as reported. An atmosphere of fear, intimidation and a high level of frustration exists that the University cannot and will not tolerate. Your role in creating or contributing to such an atmosphere is formally under investigation.

> Students have also come forward to complain that they feel victimized by bullying behavior exhibited by you. It is not appropriate to disparage students to each other or to disparage their positive relationships with other faculty members. It is not appropriate to barge in the Dean's office without an appointment and demand immediate attention in response to something or someone who has made you angry. It is not appropriate for you to yell in anger from your office to a colleague in an adjacent office while that faculty member is meeting with students or is otherwise en-

gaged in work. These allegations require a forthright and honest response.

> There are numerous accounts about your making unfounded and gratuitously derogatory remarks about colleagues and students, without any concern for how this might upset them. From virtually any abstract of mounting reports of your behavior, it is indicated that you are struggling with an excessive amount of anger which you are unable to manage and regarding which you fail to have a healthy perspective. The University has been provided information that you have openly, expressly referred to Dean Cole as an "asshole;" and refer to co-workers as "pussy(s);" while exclaiming to others that you have "the University by the balls;" and/or by "the short hairs." The various persons who allegedly found themselves forced to listen to your choices of language have come forward and have declared that they will no longer suffer in silence. A significant segment of the University, including graduates, has requested that we intervene on their behalf.

The letter went on to reference pertinent sections of the collective bargaining agreement ("the Contract") and the University's Code of Faculty Professional Ethics, as well as to set forth the allegations about cancelled classes and office hours. Finally, the letter states the University's intention to "schedule an investigatory hearing to provide you with an opportunity to be heard."

Several weeks later, on May 19, 2011, a preliminary meeting was convened in order to provide DeLucca further information about the complaints made against her. Present at the meeting were Murphy, DeLucca, the Union's lawyer, John DeCubellis, and the Union's president. DeCubellis explained that he and DeLucca had been insufficiently apprised of the spe-

cifics of the allegations against DeLucca beforehand and that, consequently, he had advised DeLucca not to participate in the meeting. DeLucca departed and the meeting was terminated.

The next week, Murphy, in a letter, provided DeLucca with a partial list of the witnesses that would be testifying against her, as well as copies of correspondence sent by DeLucca that her colleagues had found offensive. In addition to general allegations, Murphy's letter also summarized five specific incidents, including the dates and people involved, and the details of their claims. The letter reiterated the University's plan to schedule a formal hearing, and suggested possible discipline that might result if the allegations were corroborated.

The hearing was held on June 9, 2011. DeLucca refused to attend, again claiming that she had received insufficient information beforehand. Eight members of the University community testified, relating a variety of episodes of DeLucca's abusive, cruel, capricious and unprofessional conduct. Union attorney DeCubellis was provided with an opportunity to cross examine the witnesses, although he was hurried along by Pamelee Murphy, who ran the hearing. Several of the witnesses submitted written statements, and copies of correspondence with DeLucca. These additional exhibits comprised an affidavit from a current student concerning DeLucca's refusal to allow him to study abroad at a graphics design program in the Netherlands; a statement from a recent graduate and correspondence she had sent to the dean while still matriculating relates to the cancellation of nine of DeLucca's classes in the year; and correspondence between the dean and a former visiting professor, which concerned, in part, a student who had left the University after DeLucca re-

vealed personal confidential information about her during a class.

Following the hearing, DeLucca and the Union were provided with a transcript of the proceedings, and Murphy provided DeCubellis with several weeks to provide a response or rebuttal. DeCubellis responded by letter on behalf of DeLucca, describing the University's actions as "extremely unorthodox, unfair, biased, and predisposed ...;" with Pamelee Murphy serving as "judge, jury and executioner." He explained further that DeLucca and the Union think that "the entire process has been tainted and that the ultimate result may already be predetermined." Consequently, DeCubellis explained, he had advised DeLucca not to present any detailed response to the allegations, but only to issue "a general denial that she has engaged in any wrongdoing and/or misconduct that would warrant any disciplinary action against her."

### Discipline and resulting grievance

On August 16, 2011, DeLucca was suspended for two weeks without pay. Shortly thereafter, she filed a grievance, claiming that the suspension was in retaliation for her 2010 grievance. Two weeks later, the Union amended DeLucca's grievance, adding an additional claim that her suspension was not based on just cause, in violation of Articles V and IX of the Contract.

DeLucca's grievance went through established procedures. It was denied at Step 1 by the provost in November 2011; and denied at Step 2 by the University president in March 2012 following a grievance meeting attended by DeLucca and several representatives of both the University and the Union. President Farish's denial letter explains that he has "carefully considered yours and the Union's grievance submissions, as well as the positions and statements of all parties in attendance at the Step 2 meeting." Farish continued:

The record does not support your original August 26th claim that the discipline was issued to you in retaliation for your prior participation in grievance activity in violation of Article X.C.2. Neither you nor your representatives advanced any evidence that would even offer tangential support for, much less establish that, the basis for the discipline issued was for any other reason than those identified in the August 16th disciplinary notice. There has been no evidence either identified or advanced that would suggest that the disciplinary action was in any way a retaliation for your having filed prior grievances. In fact, this claim was not even mentioned during your Step 2 hearing before me.

Similarly, DeLucca's other claims, that her discipline was without just cause and that it was imposed without due process, were rejected by Farish as without merit, with several pages of explanation. Among the arguments set forth by Farish on the issue of whether or not there was just cause for DeLucca's suspension was the University's contention that the Contract contained no provision that set a standard for discipline, or that limited the University's ability to impose discipline in any way.

### The arbitration

The Union then sought arbitration on its claims. Prior to the arbitration, the parties framed the issues for the arbitrator, and agreed on the documents to be presented. The threshold issue was the one articulated by President Farish in the Step Two grievance denial letter: was the discipline imposed upon DeLucca subject to the Contract's grievance and arbitration procedures? The University's position was that DeLucca's suspension was not arbitrable, because the Contract had no provision limiting the University's ability to discipline its employees, and because the parties could only seek arbitration for violations of the Contract. In an email submitted by the Union to the arbitrator, the issues to be arbitrated were posed:

On the arbitrability question the issue is framed as follows: Is the Union's challenge to the University's August 2011 decision to suspend Professor DeLucca for two weeks arbitrable under the 2008–2012 CBA between Roger Williams University and the RWUFA/NEARI?

The University would bear the burden of proof on this issue.

If you determine the matter not to be arbitrable the grievance would be denied on that basis and his [sic] analysis would stop there.

If the you [sic] determine the matter to be arbitrable you would next address the "procedural fairness" question in your preliminary award.

On the "procedural fairness" question the issue is framed as follows: "Was the investigation leading to the University's decision to suspend Grievant so procedurally flawed so as to warrant reversal of the discipline on its face?"

The Union would bear the burden of proof on this issue.

If you determine the process was so procedurally flawed as to warrant a reversal, the discipline would be removed and the analysis would stop there.

If you determine the matter to be arbitrable, but not procedurally unfair so as to warrant a reversal, we'd move to the merits and schedule a hearing for that purpose.

With those issues settled by agreement, the University next petitioned the arbitrator to bifurcate the proceedings, so that the arbitrability issue could be decided first and separately. The Union objected. The arbitrator denied the University's request, and the arbitration proceeded with both issues before the arbitrator.

In its brief, the Union conceded that the Contract did not address disciplinary measures directly, but urged the arbitrator to interpret the Contract broadly in order to find an implied requirement of just cause for the University's actions. On its side, the University argued that disciplining its employees was the right of management, and that, moreover, the arbitrator could not exceed his authority by adding provisions to the Contract, or finding implied provisions, that had not been negotiated by the parties. The arbitrator ruled in favor of the University, writing, *inter alia:*

> ... [T]he [RI] Supreme Court stated that to be substantively arbitrable the parties must have clearly stated in the contract that they agreed to arbitrate the matter. Such a statement does not appear in this contract and for that reason the dispute is not arbitrable. In light of the decision on the arbitrability issue, it is not necessary to address the second issue.

The arbitrator, and the University, considered the matter at an end, but the Union chose to pursue it further before this Court.

### The Complaint

In its federal court complaint, the Union seeks to vacate the arbitrator's Award. Its central claim is that the arbitrator exceeded his authority because he relied on the parties' bargaining history in formulating the Award, in violation of the Contract. Beyond that, the Complaint's allegations are conclusory: the Award does not draw its essence from the Contract; the Award is not based on a plausible interpretation of the Contract; the Award is completely irrational; and the arbitrator disregarded the law.

### Standard of Review

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. *Continental Cas. Co. v. Canadian Univ. Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991).

The ultimate burden of persuasion is on the moving party to show that the undisputed facts entitle it to summary judgment as a matter of law. *Jaroma v. Massey,* 873 F.2d 17, 20 (1st Cir.1989). The moving party must show that "there is an absence of evidence to support" the nonmoving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that burden is met, the nonmoving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. *Oliver v. Digital Equipment Corp.,* 846 F.2d 103, 105 (1st Cir.1988).

The analysis required for cross motions for summary judgment is the same. *Scottsdale Ins. Co. v. Torres,* 561 F.3d 74, 77 (1st Cir.2009) ("The presence of cross-motions neither dilutes nor distorts this standard of review."). In evaluating cross-motions, the court must determine whether or not either party is entitled to judgment as a matter of law based upon the undisputed facts. *Id.*

The present case is an appeal of an arbitration award where the parties agreed to submit their dispute over arbitrability to arbitration. In such a case, the proper standard of review is a deferential one: the Court will accept the arbitrator's findings of fact that are not clearly erroneous, and decide questions of law *de novo. First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 948, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). The issues in this

case do not fit neatly into these pigeon-holes for two reasons. Because he ruled on the arbitrability issue only, the arbitrator made no findings of fact. Consequently, the Court will glean the undisputed facts, as necessary, from the record submitted to the arbitrator. Secondly, the Union argues that its retaliation claim was mistakenly disposed of by the arbitrator and that, in fact, this claim survives the arbitration Award and remains to be addressed. To rule on this issue the Court will likewise rely upon the record submitted to the arbitrator.

### Analysis

The Court will address three issues that are in contention between the parties. First, the Court will review the arbitration Award and its determination of non-arbitrability. This analysis will include the sub-issue raised in the Union's complaint: that the arbitrator improperly relied upon bargaining history in rendering the Award. Second, the Court will determine whether or not the retaliation claim was effectively reserved by the Union for further review. And, third, the Court will address the Union's concerns over the process that was due and provided to DeLucca during the course of the University's investigation.

### Arbitrability

Both sides agree that the Contract contains no express provision governing disciplinary measures. However, the Union argues that the University's obligation to impose discipline only when there is just cause is implied by the totality of the Contract's language. Without an implied just cause requirement, the Union argues, the notion of progressive discipline is meaningless. The University could, hypothetically, suspend a professor repeatedly for no good reason, then terminate that professor because of the accumulated suspensions. The Union argues further that

there is extensive precedential support for the principle that matters that are excluded from the reach of arbitration must be expressly excluded by the Contract.

On the other side, the University argues that, while the Contract requires just cause for the termination of a tenured professor, the omission of a standard for discipline was intentional. According to the University, discipline, though not expressly listed, falls into the provision of retained management rights found in Article III:

> It is recognized that the RWU, through its Chief Executive Officer, has the authority and responsibility to effectively formulate the University's curriculum, budget, grading systems, admissions and matriculation standards, academic calendars, size of the student body, tuition and fees, hiring and termination and other traditional management functions.

Moreover, the express inclusion of a just cause requirement for discipline in two other contemporaneous contracts between these same parties demonstrates that the parties will purposefully include such a provision when there is an agreement to do so. The other contracts cover facilities workers and professional support staff at the University. The University also points to two faculty contracts for the years 1984–89 which included a provision imposing an "arbitrary and capricious" standard for discipline—a provision that was omitted from subsequent agreements.

The University cites additional provisions in the Contract in support of its position. First, the language of Article X of the Contract limits the proper subject of a grievance to "a violation, misinterpretation, or misapplication" of the Contract, and, consequently, does not cover every potential dispute between the parties. If a dispute is not grievable, it cannot be subject to arbitration, pursuant to Step 3 of

the grievance procedure as provided by Article X, section B. Secondly, Article X also contains a limitation on the power of the arbitrator: "The arbitrator shall not alter, add to or subtract from the terms of this Agreement ..."

### The Crouch decision

The arbitrator was persuaded by the University's arguments, and by a Rhode Island Supreme Court case, *School Committee of the Town of North Kingstown v. Crouch*, 808 A.2d 1074 (R.I.2002). Crouch was a tenured teacher and school principal who confessed to stealing prescription medication from his students, and was fired. The union filed a grievance over the termination of Crouch's tenured teacher status. The School Committee filed for injunctive relief in Superior Court, arguing that the teachers' contract did not provide for arbitration of disputes involving the termination of teachers for cause.

The Rhode Island Supreme Court, ruling for the School Committee, acknowledged that arbitration was favored when there was uncertainty about whether or not a dispute was arbitrable. *Id.* at 1078. "Nevertheless," the Court continued, "no one is under a duty to arbitrate unless with clear language he [or she] has agreed to do so." *Id.* at 1078. To determine issues of substantive arbitrability, the Court held, there must be a "clear statement;" that is, "some provision within the agreement— either a specific provision detailing the matter or a past practices provision incorporating implied conduct into the contract." *Id.* at 1079. In support of its holding, the *Crouch* Court also pointed out that the same parties had negotiated other contracts with provisions permitting grievances about dismissals for just cause. *Id.* at 1079–80.

In accordance with *Crouch*, the arbitrator here searched the Contract for an express provision authorizing arbitration over discipline. His review revealed that, while the contractual definition of a grievance was very limited, the management rights provision was very broad. The arbitrator also noted that a provision imposing a standard for discipline had existed in a prior contract between these parties, and that, as in *Crouch*, such provisions were present in other current contracts between these parties, covering other bargaining units. The arbitrator concluded:

> The Union presented a strong argument on behalf of the grievant and cited many authorities in support of its position of implied arbitrability. However, the parties expressly stated in the grievance section of the contract that "the arbitrator shall not alter, add to or subtract from the terms of this Agreement" and the Supreme Court stated that to be substantively arbitrable the parties must have clearly stated in the contract that they agreed to arbitrate the matter. Such a statement does not appear in this contract and for that reason the dispute is not arbitrable.

### The implied 'just cause' provision

The Court believes the arbitrator's reasoning is unassailable. To the points made by the arbitrator, the Court would add a few observations. Article IX of the Contract requires the University to have just cause in order to dismiss a tenured faculty member. However, non-tenured faculty members may be dismissed as long as such dismissal is not arbitrary or capricious—a less rigorous standard. This discrepancy weakens the Union's argument that the Contract in its entirety should be read as including an implied just cause provision.

Moreover, when courts have found an implied just cause provision, the cases have frequently involved the more compelling circumstance of dismissal, rather than discipline. In a case cited by the Union,

*Smith v. Kerrville Bus Co., Inc.*, 709 F.2d 914, 917 (5th Cir.1983), the court recognized that arbitrators often infer a just cause provision for dismissals from parts of the contract governing seniority or the grievance procedure.

> To hold as a matter of law that management could, at its sole discretion, terminate an employee without cause would in effect allow it the unqualified power to avoid contractually mandated rights and benefits.

*Id.* at 919. *See also Shearson Hayden Stone, Inc. v. Liang,* 653 F.2d 310, 312 (7th Cir.1981) ("It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for 'just cause.'"); *SFIC Properties, Inc. v. International Ass'n of Machinists & Aerospace Workers,* 103 F.3d 923, 925–26 (9th Cir. 1996); *Federated Depart. Stores v. United Food & Commercial Workers Union, Local 1442,* 901 F.2d 1494, 1497 (9th Cir. 1990); *Chauffeurs, Teamsters & Helpers Local Union No. 878 v. Coca–Cola Bottling Co.,* 613 F.2d 716, 720 (8th Cir.1980); *Boone v. Armstrong Cork Co.,* 384 F.2d 285, 291 (5th Cir.1967); *Monaghan v. Central Vermont Ry., Inc.,* 404 F.Supp. 683, 687 (D.Mass.1975); *Peerless Laundry Co.,* 51 LA 331, 336 (1968); *New Hotel Showboat Inc.,* 48 LA 240, 242 (1967).[1]

### The other contracts and "bargaining history"

As the arbitrator noted, the Union also represents the professional support staff at the University, and a separate collective bargaining agreement codifies this working relationship. The agreement presently in effect provides at Section 7.C.III: "The University will not suspend or discharge a non-probationary MBU without just cause. A non-probationary MBU will not be formally reprimanded arbitrarily or capriciously." More significantly, two faculty contracts in the 1980s included language limiting the University's ability to suspend members of the bargaining unit and providing recourse to the grievance procedure for suspensions.[2] The inclusion of these provisions in these other contract permits the inference that a standard for the imposition of discipline was purposefully omitted from the present contract between the faculty and the University.

In its federal court complaint, the Union objects to the arbitrator's reference to the previous contracts between the parties, claiming that the Contract "prohibits the parties from relying on bargaining history in arbitration." The provision cited by the Union is Article X.C.6, which states:

> Neither party shall raise as bargaining history in a future arbitration any proposal made in negotiations of the successor contract to the 1995–1998, 1998–2001, and 2001–2004, and 2004–2008 contract to modify, delete or replace contractual language contained in Articles V, VII, VIII, IX and XV.

While the time frames referenced are a bit confusing, what is perfectly clear to the

---

**1.** Plaintiff has also cited a few cases where arbitrators inferred a just cause standard for disciplinary actions. In one such case, *Velsicol Chemical Corp.*, 52 LA 1164, 1166 (1969), the arbitrator listed supporting cases but specified in a footnote: "Though all these cases relate to the right of an employer to discharge an employee under collective bargaining agreements which do not contain the usual 'just cause' limitation on that right, their reasoning is equally applicable to his right to impose the lesser penalty of suspension or disciplinary layoff." Whether or not this reasoning is "equally applicable" is a debatable point which does not have to be settled herein.

**2.** These identical provisions are found in Article VIII, sec. D of the 1984–86 and the 1986–89 contracts.

Court is that "any proposal made in negotiations" is different than a completed, agreed-upon contract, to which attaches no aura of confidentiality and is, presumably, a matter of public record.

■ For all these reasons, the Court affirms the arbitrator's Award and holds that the discipline imposed upon DeLucca is not arbitrable under the Contract between the parties.

### The retaliation claim

Although the retaliation claim was not asserted in the Union's Complaint, and neither was it addressed by the arbitrator, it is argued in the parties' briefs and was addressed at oral argument. It is undisputed that DeLucca's grievance initially claimed that her suspension was an act of retaliation for the grievance she had filed the previous year. Soon after filing the most recent grievance, it was amended to add a claim that there was no just cause for the suspension.

■ The University argues that DeLucca dropped her retaliation claim when the grievance was amended. The Union denies this, arguing that the just cause claim was a second, additional claim. The Union argues further that when the parties referred the matter to arbitration, the Union intended the arbitration over arbitrability to be a "preliminary" phase. The Award must be vacated, the Union argues, because the arbitrator mistakenly concluded that the matter was fully resolved after he decided the arbitrability issue. Consequently, the effect of the Award was to dispose of the grievance in its entirety. The Court agrees that the Union never expressly withdrew the retaliation claim; however, the undisputed facts demonstrate that the Union has waived the claim.

At no point in this years-long process did DeLucca or the Union advance any evidence or facts to demonstrate that the suspension was an act of retaliation. The Union had many opportunities to raise and address the retaliation claim, but never did so. First, during the period prior to the suspension when the University was investigating the allegations against DeLucca, both DeLucca and the Union refused to participate in or contribute to the proceedings. As a result, the Union failed to take advantage of this opportunity to raise the retaliation issue.

After the hearing, the Union was encouraged by the University to respond in writing to the allegations against DeLucca. The Union's attorney wrote a five-page letter to the University's general counsel. This letter never once makes reference to retaliation. Had the Union believed that the allegations were in any way part of an effort by the University to retaliate against DeLucca for union activity, it would have made sense to assert the claim at this point.

Following the suspension, during the two internal steps of the grievance procedure, the Union never raised the retaliation claim. University President Farish noted in his letter denying DeLucca's grievance at the second step that the Union offered no evidence "that would even offer tangential support for" a suggestion "that the disciplinary action was in any way a retaliation for your having filed prior grievances." In fact, President Farish concluded, the retaliation claim was not even mentioned during the grievance meeting.

Similarly, when the matter proceeded to arbitration, the Union made no effort to reserve the retaliation claim for a later phase. During the parties' negotiations concerning the framing of the issues for the arbitrator, there was no reference to any retaliation claim that the Union intended to revisit. In fact, the Union wrote

to the arbitrator, stating, "If you determine the matter not to be arbitrable the grievance would be denied on that basis and his analysis would stop there."

Finally, during the dispute over whether or not to bifurcate the issues before the arbitrator, there was no reference to the retaliation claim. Instead, in the Union's objection to the University's Motion to Bifurcate, it argued that bifurcation "would defeat the ultimate objectives of arbitration, which are, once again, the *quick, efficient, economical* and fair resolution of disputes." (Emphasis added).

The Union now argues that it wanted to resolve the arbitrability issue first, then planned to address the retaliation claim at a subsequent arbitration. This logic does not add up. The University is prohibited by Article C, section C of the Contract from retaliating against a union member for participating in a grievance. Why wouldn't the Union rely on this argument first, rather than advancing an argument based on a provision that is only implied? If DeLucca had been suspended in retaliation for her 2010 grievance, that would mean that she was not suspended for "just" cause. This would be a more direct and efficient method to try to overturn DeLucca's discipline. It makes no sense that the Union would have started with the arbitrability issue with the idea of subsequently returning to the retaliation claim.

At any rate, the retaliation claim cannot survive summary judgment review. When challenged by the moving party, the non-moving party cannot rest on its pleadings, but must "set forth specific facts demonstrating that there is a genuine issue for trial" as to the claim that is the subject of the summary judgment motion. *Oliver v. Digital Equipment Corp.*, 846 F.2d at 105. Here, the Court sees no evidence that the University suspended DeLucca in retaliation for her filing the grievance in 2010.

The allegations against DeLucca involved many members of the University community from students to former students, colleagues and ex-colleagues. There is no evidence that the allegations brought by those witnesses were orchestrated by the University. Moreover, there is no evidence that the Union attempted to reserve the retaliation claim for later adjudication. The Court holds that DeLucca's retaliation claim has been waived as a matter of law.

### Due process

Before the arbitrator, the Union argued that the investigation into the allegations against DeLucca was so procedurally flawed that the suspension must be rescinded. When he determined that the suspension was not subject to arbitration, the arbitrator stated that he would not reach this second issue. However, the Union continues to assert this argument before the Court. In addition, the Union argues that the arbitrator erred in finalizing the arbitration without reaching this second issue, because the due process claim was an entirely separate claim from the just cause claim—a different and independent basis from which to attack the propriety of the suspension.

To support its initial due process argument—that the University's pre-suspension investigation was procedurally flawed—the Union, in its brief, writes that, "The elements of procedural due process have been so frequently identified in the texts and arbitrations that the recitation of these elements is practically by rote." In reliance on these texts, the Union alleges that the University violated DeLucca's right to be notified of the specific charges against her and to review the supporting evidence before her initial meeting with the University. According to the Union, this information should have been provided to DeLucca before, or at least at the same time as, she received the first communica-

tion from Pamelee Murphy indicating that the University was initiating an investigation into her conduct. This argument is without merit.

The Union compares the University's procedures, unfavorably, to those provided by "the American adversarial system of justice." But, DeLucca's rights in these circumstances are derived from the Contract, not from the United States Constitution. *See United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); *Wightman v. Springfield Terminal Rwy. Co.*, 100 F.3d 228, 232 (1st Cir.1996). The rights provided by the Contract include the due process rights accorded in cases of dismissals, which state that tenured professors can only be dismissed for just cause and that the notice of dismissal must include the reason for the dismissal. The three-step grievance procedure is available for violations of these provisions and other contractual terms. These procedures and much more were accorded to Professor DeLucca. On April 6, 2011, she was informed by letter of some of the complaints against her. While this letter lacked specifics, it was specific enough and more than sufficient to put DeLucca on notice of the kinds of complaints that were being lodged against her. Next, she was invited to an informal meeting with her union representative to learn more about the complaints. DeLucca refused to attend this meeting. She next received an extensive and detailed written account of the developing investigation from Pamelee Murphy on May 25. DeLucca then had an opportunity to participate in a full-scale judicial-type hearing, complete with witnesses and cross examination. DeLucca also declined to attend this hearing. After receiving a full transcript of those proceedings, she was afforded another opportunity to refute the allegations. The Union responded to this invitation with a general denial of wrongdoing. All this process was significantly above and beyond anything required by the Contract. After the investigation and the suspension, DeLucca went through each step of a three-step grievance procedure, including arbitration before a third party. For some reason, the Union believes that it was entitled to all the information about the allegations before any of these procedures commenced, but these procedures were undertaken by the University in order to learn about the complaints against DeLucca. In July this fact-finding process concluded, and soon thereafter DeLucca was notified of her suspension. The Court holds as a matter of law that DeLucca was afforded *more* process than she was actually due under the Contract, and holds further that the University's investigation was not procedurally flawed.

■ The Union's second claim on this issue is that the arbitrator erred in concluding the arbitration without addressing the due process argument. However, the Court holds that the Union waived this claim prior to the arbitration when the parties formulated the issues for the arbitrator. In the email to the arbitrator, the Union's waiver was explicit: "If you determine the matter not to be arbitrable the grievance would be denied on that basis and his analysis would stop there. If you determine the matter to be arbitrable you would next address the 'procedural fairness' question in your preliminary award." The Union's email, coupled with this Court's conclusion that the due process claim is not only meritless but frivolous, brings *this matter to a close.* The arbitrator's Award is upheld in full.

### Conclusion

For these reasons, the Court grants the University's Motion for Summary Judg-

ment, and denies the Union's motion for summary judgment. The Award of the arbitrator is affirmed. The Clerk shall enter judgment accordingly.

So ordered.