**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

No. 14-1966

—————————

NANCY A. WILLIAMS, on her own behalf and on behalf of all
others similarly situated,

            Plaintiff - Appellant,

      and

SANDRA SHERMAN,

            Plaintiff,
      v.

GENEX SERVICES, LLC, f/k/a GENEX SERVICES, INC.,

            Defendant - Appellee.

—————————

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Marvin J. Garbis, Senior District
Judge.  (1:13-cv-01942-MJG)

—————————

Argued:  October 28, 2015          Decided:  December 18, 2015

—————————

Before AGEE and WYNN, Circuit Judges, and HAMILTON, Senior
Circuit Judge.

—————————

Affirmed by published opinion.  Senior Judge Hamilton wrote the
opinion in which Judge Agee and Judge Wynn joined.

—————————

**ARGUED:** Nicholas Woodfield, THE EMPLOYMENT LAW GROUP, P.C.,
Washington, D.C., for Appellant.  Russell Robert Bruch, MORGAN,
LEWIS & BOCKIUS LLP, Washington, D.C., for Appellee.  **ON BRIEF:**
R. Scott Oswald, THE EMPLOYMENT LAW GROUP, P.C., Washington,

D.C., for Appellant. Michael J. Puma, Philadelphia, Pennsylvania, Allyson N. Ho, MORGAN, LEWIS & BOCKIUS LLP, Dallas, Texas, for Appellee.

_____

HAMILTON, Senior Circuit Judge:

Plaintiff-Appellant, Nancy Williams (Williams), is employed by Defendant-Appellee, Genex Services, LLC (Genex), as a Field Medical Case Manager (FMCM). She brought this action against Genex claiming that Genex was required to pay her overtime under the Fair Labor Standards Act (the FLSA or the Act), 29 U.S.C. §§ 201 to 219, and the Maryland Wage and Hour Law (MWHL), Md. Code Lab. & Empl. §§ 3-401 to 3-431, for the overtime hours she worked. The district court granted summary judgment in favor of Genex. Williams appeals, and we now affirm.

I

A

The FLSA protects "all covered workers from substandard wages and oppressive working hours." Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728, 739 (1981); see also 29 U.S.C. § 202(a) (noting that the FLSA protects "the minimum standard of living necessary for health, efficiency, and general well-being of workers"). Toward these ends, the FLSA establishes the general rule that employers must pay overtime compensation to employees who work more than forty hours during a seven-day work week. 29 U.S.C. § 207(a)(1).[1] Employees are

---

[1] Overtime compensation is paid "at a rate not less than one and one-half times the regular rate at which [the employee] is employed." 29 U.S.C. § 207(a)(1).

entitled to overtime compensation according to the general rule unless their employer proves that one of the Act's many exemptions applies. See Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392 (1960) (noting that the FLSA's "exemptions are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit"). Genex asserts that Williams is not entitled to overtime compensation under the general rule because she is "employed in a bona fide . . . professional capacity." 29 U.S.C. § 213(a)(1).

The FLSA provides that any "employee employed in a bona fide . . . professional capacity" is exempt from the general rule requiring overtime compensation. Id. § 213(a)(1). The responsibility for outlining the contours of this exemption lies with the Secretary of Labor (the Secretary). See id. (permitting the Secretary to "define[] and delimit[]" various terms in the FLSA). The relevant Department of Labor (DOL) regulations define "employee employed in a bona fide . . . professional capacity," id., as any employee who is "[c]ompensated on a salary or fee basis at a rate of not less than $455 per week," 29 C.F.R. § 541.300(a)(1), and whose "primary duty is the performance of work," id. § 541.300(a)(2), "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of

4

specialized intellectual instruction," id. § 541.300(a)(2)(i), or "[r]equiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor," id. § 541.300(a)(2)(ii).[2]

The DOL regulations define "primary duty" as "the principal, main, major or most important duty that the employee performs." Id. § 541.700(a). Under § 541.700(a),

> [d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Id.

The DOL regulations recognize that the amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee:

---

[2] The parties agree that "professional capacity" has the same meaning under the FLSA and the MWHL. Consequently, an employee who is employed in a professional capacity under the FLSA necessarily is employed in a professional capacity under the MWHL. See MD. Code Regs. 09.12.41.17 ("'Professional capacity' has the meaning stated in 29 CFR §541.300 et seq."). Because the viability of Williams' MWHL claim turns on the viability of her FLSA claim, we focus our analysis on her FLSA claim.

[E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work. Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

Id. § 541.700(b).

There is no dispute that Williams earns more than $455 per week. However, Genex claims that Williams' primary duty is the performance of work (1) requiring advanced knowledge, (2) in a field of science or learning, (3) that is customarily acquired by a prolonged course of specialized intellectual instruction, and, thus, the exemption, referred to in the DOL regulations as the "[l]earned professional[]" exemption, id. § 541.301, applies.[3] Williams counters by arguing that she is not engaged in the performance of such work.

B

Genex provides integrated managed care services to its

---

[3] Under the DOL regulations, a registered nurse generally meets the learned professional definition. See 29 C.F.R. § 541.301(e)(2) ("Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."). In contrast, a licensed practical nurse generally does not meet the learned professional definition because "possession of a specialized advanced degree is not a prerequisite for entry into" such an occupation. Id. It is a stipulated fact that Williams is a registered nurse.

clients, which include various employers and workers' compensation insurers. Such services focus on controlling health care and disability costs, ensuring that quality health care is provided to injured workers, and improving return-to-work rates. At Genex, FMCMs help injured workers return to work as quickly, safely, and cost-effectively as possible.

Williams began working for Genex as an FMCM in 2011 after Genex acquired the assets of her former employer, Intracorp.[4] Williams is paid a salary by Genex. She received $83,354.14 in total compensation in 2012 and $81,103.29 in total compensation in 2013.

Williams has two supervisors at Genex, Andy Nussdorf (Nussdorf), Branch Manager for Genex's Field Case Management Branch in Elkridge, Maryland, and Sofia Harris (Harris), the Case Management Supervisor for Genex's Elkridge Office. Because FMCMs at Genex work in the field, rather than in an office, Williams rarely sees her supervisors. She testified at her November 5, 2013 deposition that she last saw Nussdorf in September 2011 and that she last saw Harris in the summer of 2012. Williams testified that she had "[i]rregular" phone

---

[4] Williams received a Bachelor of Science in nursing from Villa Julie College in 2007. In addition to being a registered nurse, Williams holds several professional certifications, including Certified Case Manager, Certified Disability Management Specialist, Certified Life Care Planner, Certified Critical Care Nurse, and Medicare Set Aside Consultant.

contact with Nussdorf and Harris, indicating that "a week or a month might go by without a phone call with them." (J.A. 247). With regard to emails, Williams acknowledged that "sometimes a long time goes by and there's no communication" between her and either Nussdorf or Harris. (J.A. 252).

The parties agree that Maryland law requires an FMCM to be a registered nurse (RN) and to have a Workers Compensation Case Manager Certification from the Maryland Board of Nursing. Although Williams holds these credentials, she does not provide hands-on care. Rather, according to Genex's FMCM job description, Williams is "[r]esponsible for assessment, planning, coordination, implementation and evaluation of injured/disabled individuals involved in the medical case management process." (J.A. 682). FMCMs "work[] as an intermediary between carriers, attorneys, medical care providers, employers and employees to ensure appropriate and cost-effective healthcare services and a medically rehabilitated individual who is ready to return to an optimal level of work and functioning." (J.A. 682). As a result, each FMCM at Genex is required to: (1) "[u]se[] clinical/nursing skills to help coordinate the individual's treatment program while maximizing cost containment"; (2) "[s]erve[] as an intermediary to interpret and educate the individual on his/her disability, and the treatment plan established by the case manager, physicians,

8

and therapists"; (3) "[w]ork[] with the physicians and therapists to set up medical assessments to develop an overall treatment plan that ensures cost containment while meeting state and other regulator's guidelines"; (4) "[r]esearch[] alternative treatment programs such as pain clinics, home health care, and work hardening"; and (5) "[w]ork[] with [the] employer[] on modifications to job duties based on medical limitations and the employee[']s functional assessment." (J.A. 683).

When working with an injured worker's case, Williams assesses the injured worker's medical condition and treatments in an effort to better understand the case and to look for opportunities to minimize the injured worker's time away from work. She interviews the injured worker and analyzes the injured worker's pertinent medical information, including medical history, current status, diagnosis, prognosis, and current treatment plan. From there, she continues to monitor the injured worker's medical condition. She often attends medical appointments with the injured worker and is free to ask physicians about the course of treatment. She educates both the injured worker and the insurance claims adjuster on the injured worker's injuries and treatments, and sometimes makes recommendations for alternative forms of treatment.

Williams is also responsible for developing an individualized care plan that will assist the injured worker in

9

returning to work in a timely and safe manner. Essential parts of developing that plan include

> setting mutually agreed-upon goals with measurable objectives, determining action steps toward achieving goals, and selecting essential resources and services through consultation and collaboration with health care professionals, the ill/injured person, and the family or other support persons.

(J.A. 183-84). Each individualized care plan that Williams develops must establish and document measurable short- and long-term goals for the injured worker. Williams performs medical research when needed to develop individualized care plans and analyzes whether the goals established in the care plans have been met. Individualized care plans also contain information on whether the existing and planned medical treatments are consistent with clinical criteria and treatment guidelines for the medical condition.

FMCMs at Genex also prepare periodic status reports on the condition and/or progress of the injured worker. Most of Genex's clients have a template or report format that FMCM's use in preparing these reports. Williams admits she uses her medical knowledge and training in developing care plans and status reports and recognizes that the standard of care for nurses in Maryland requires that care plans be tailored to reflect current nursing practices. She also uses her medical knowledge and training to provide relevant information to

10

physicians so that the physicians can make the appropriate decisions regarding the injured worker's treatment. She is also free to make recommendations to physicians concerning a specific course of treatment, and the record reflects that on occasion her recommendations are followed.

In addition to creating her own individualized care plans, Williams evaluates life care plans to assist Genex clients in litigation. For example, in one evaluation, Williams examined the patient's extensive medical records, interviewed the patient and her mother, conducted research, and explained why the life care plan proposed was "wholly void" because, among other things, the patient's disability was, in her professional opinion, attributable to a preexisting condition rather than an auto accident. (J.A. 544).

C

On July 3, 2013, Williams brought a two-count complaint against Genex in the United States District Court for the District of Maryland. Count I pled a claim under the MWHL, and Count II pled a FLSA claim.[5] Following discovery, GENEX moved

---

[5] Williams filed the complaint as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and others similarly situated to her. At least one individual, Sandra Sherman, sought to join the purported class. No class certification order was entered by the district court pursuant to Rule 23(c)(1), and the parties agreed, "for the sake of efficiency," (Appellant's Br. at 3), to limit discovery to
(Continued)

for summary judgment, asserting that Williams was a learned professional. On September 4, 2014, in a written memorandum opinion, the district court agreed that Williams was a learned professional. Because Williams is a licensed RN and is required to be an RN to work for Genex in Maryland, the district court determined that Williams performed work in a field of science that is customarily acquired by a prolonged course of specialized intellectual instruction. The district court then turned to the work requiring advanced knowledge prong, which is defined in relevant part as follows:

> The phrase "work requiring advanced knowledge" means work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances.

29 C.F.R. § 541.301(b). Applying this definition to the facts in a light most favorable to Williams, the district court concluded that Williams performed work requiring advanced knowledge. The district court observed that Williams "uses her advanced knowledge to examine injured employees' medical

whether Williams' job as an FMCM was properly classified as exempt under the FLSA and the MWHL. In effect, the parties agreed that if Williams' claims failed, so too did the claims of any purported class members.

12

conditions and advise[s] them on what to expect." (J.A. 75-76). The district court further observed that Williams' status reports "indicate that she not only . . . assesses and analyzes claimants' medical conditions, but also provides her own commentary and suggestions." (J.A. 76). The district court also cited the fact that Williams was not closely supervised and the fact that she regularly exercises judgment and discretion in support of its conclusion that Williams' work required the use of her advanced knowledge.

Based on her job duties, the lack of close supervision, and the wide discretion exercised by Williams, the district court rejected Williams' argument that she performed mainly clerical tasks, noting that "even though Williams does not have ultimate decision-making power as to an injured employee's treatment or care plan, she still uses her discretion and judgment to evaluate cases and make recommendations for future courses of action, much like a licensed RN engaged in direct patient care." (J.A. 78). The district court also rejected Williams' argument that because her status reports are prepared using templates, she is nothing more than a "mere scribe." (J.A. 79). The district court noted that report preparation only accounted for a small part of Williams' job duties, and, in any event, the preparation of these reports required the use of her advanced nursing knowledge.

13

The district court entered judgment in favor of Genex on the same day it issued its memorandum opinion. Following the entry of judgment, Williams noted a timely appeal.

II

A

Under Rule 56(a) of the Federal Rules of Civil Procedure, the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making that determination, the district court must view the evidence in the light most favorable to the nonmoving party. Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014).

Although we view all the underlying facts and inferences in the record in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his [or her] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). Consequently, summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986). The

14

nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of her position. Anderson, 477 U.S. at 252. We review the grant of summary judgment de novo. Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc).

Whether an employee is exempt from the FLSA's overtime requirements is a mixed question of law and fact; "[t]he question of how the [employees] spent their working time . . . is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law." Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714 (1986); see also Walton v. Greenbrier Ford, Inc., 370 F.3d 446, 450 (4th Cir. 2004) ("The determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question."). An employer must prove by clear and convincing evidence that an employee qualifies for exemption. Shockley v. City of Newport News, 997 F.2d 18, 21 (4th Cir. 1993).

B

Genex argues that Williams is not entitled to overtime compensation because, based on the undisputed facts concerning her job responsibilities, her position was properly classified as exempt under the learned professional exemption. More specifically, Genex claims that Williams exercises discretion

15

and judgment every day, is not closely monitored or supervised, and most importantly, predominately uses her RN skills on a daily basis in the performance of her duties.

In response, Williams claims that the learned professional exemption does not apply and that, at a minimum, factual disputes preclude entry of summary judgment in Genex's favor. From Williams' point of view, her duties consist of nothing more than clerical, nondiscretionary, and routine work. More specifically, she claims that her primary duty is not the performance of exempt work; rather she claims that: (1) she is a mere "liaison between employer and doctor to keep the doctor appraised on what the physical requirements the claimant's job entails," (Appellant's Br. at 36); (2) that she is "nothing more than a scribe relaying information back to the adjustors," id. at 38; and (3) that any "lay person" can perform the job of FMCM. At bottom, Williams posits that, even if she uses her advanced knowledge in the performance of her duties on occasion, she does so substantially less than the 50 percent threshold set forth in § 541.700(b).

In our view, the district court did not err when it concluded that Williams' primary duty involved the performance of exempt work. First off, Williams' own description of her core job responsibilities fatally undermines her argument that her work involves primarily clerical, nondiscretionary, and

16

routine work.   On her resume, Williams describes her job as follows:

> Serve as case manager for multidisciplinary files assessing patient needs, designing research-driven life care plans, and coordinating [the] delivery of care.  Oversee medical record reviews, extensive client interview process, collaboration with the treatment team, data analysis, and research to project current and long-term medical needs and their economic impact.  Coordinating case management initiatives in concert with providers.  Develop strong professional relationships through proactive communication and coalition-building, facilitating life care planning, trust management, litigation support.

(J.A. 340).  This description conflicts with the labels Williams applies to her job duties in the context of this litigation, namely that her work is clerical, nondiscretionary, and routine. It is well-settled that a plaintiff may not avoid summary judgment by submitting contradictory evidence.  See Barwick v. Celotex Corp., 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").  To do so "would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  Id. (citation and internal quotation marks omitted).

Notwithstanding this ploy, the record evidence submitted demonstrates beyond question that Williams regularly uses her skills, training, and knowledge as an RN to perform her duties

17

as an FMCM.  See 29 C.F.R. § 541.301(e)(2) ("Registered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption."). Consistent with her core job responsibilities which focus on the use of her "clinical/nursing skills," (J.A. 683), Williams develops individual care plans by reviewing injured workers' medical records and interviewing such workers about their medical conditions and recovery. The development of these care plans must be consistent with clinical criteria and follow current nursing practices in Maryland. She also coordinates medical care and communicates with medical providers, insurers, employers, and attorneys to assess whether injured workers are receiving appropriate care. She educates injured workers on their disabilities and answers any questions they may have in an effort to facilitate their return to work. In the exercise of her discretion and judgment, she makes recommendations concerning alternate forms of treatment. In her periodic reports on injured workers, she assesses and analyzes the injured workers' conditions, but also provides her own commentary and suggestions. Her training and experience as an RN is indispensable in the performance of these duties. In other words, the record makes clear that Williams' responsibilities, performed with little or no direct supervision, involve the consistent exercise of discretion and

18

judgment as well as the use of her advanced nursing knowledge to "analyze, interpret or make deductions from varying facts or circumstances." 29 C.F.R. § 541.301(b).

Sensing that her work involves the use of her RN skills, Williams points us to the 50 percent threshold in § 541.700(b), suggesting that she needs to spend at least 50 percent of her time doing exempt work to qualify for the learned professional exemption. Such is not the case. The amount of time an employee spends on exempt work is not dispositive of whether the employee is a learned professional. See id. § 541.700(b) ("Time alone, however, is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work."). And even if some of her job duties fell under the rubric of nonexempt work, such job duties only amounted to a small portion of her overall job duties, as the record reflects that the vast majority of her work involved the use and application of her RN skills.

We also note that Williams' high salary, over $80,000.00 in the two years preceding this litigation, itself creates doubt as to whether she falls within the FLSA's intended protected class. We have previously emphasized that, "[a]lthough salary alone is not dispositive under the FLSA, . . . the FLSA was meant to protect low paid rank and file employees." Darveau v. Detecon, Inc., 515 F.3d 334, 338 (4th Cir. 2008) (citation and internal

19

quotation marks omitted); see also Marshall v. Western Union Tel. Co., 621 F.2d 1246, 1251 (3d Cir. 1980) (noting that the FLSA was meant to protect low paid "rank and file" employees, not higher salaried managerial and administrative employees who are "seldom the victims of substandard working conditions and low wages."). Indeed, the FLSA's implementing regulations state that "[a] high level of compensation is a strong indicator of an employee's exempt status." 29 C.F.R. § 541.601(c).

In sum, Williams has failed to come forward with any persuasive evidence that Genex violated the FLSA by classifying her primary duty as professional. Thus, we conclude that Williams is exempt from the mandatory overtime provisions of the FLSA.

## III

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED