A. Holden's Pay
Cenpatico maintains that Holden was paid her salary regardless of how many hours she worked each week.[12] However, Cenpatico's Rule 30(b)(6) designee, Ms. Muldoon,[13] testified that if Holden took more than four hours off and had depleted her vacation, sick and personal time, she would have to make up those hours or they would be deducted from her pay.[14] Nevertheless, she also testified that she does not recall any such deductions being made to Holden's pay and that no such deductions were made to other utilization managers' pay during her tenure.[15]
Cenpatico's "Pay Procedures and Policies" state, among other things:
It is Centene's intent to pay exempt employees on a salary basis. Therefore, Centene prohibits the making of improper deductions from the salaries of exempt employees because of variations in the quality and quantity of the work performed . Unsatisfactory quantities or quality of work will be addressed, not by reductions in salary, but rather through regular performance management methods including the performance evaluation and discipline processes. Other deductions from Exempt employee's salaries that Centene views as improper and therefore are prohibited include the following:
• Absences of less than a full work week occasioned by Centene or by the operating requirements of business;
• Absences of less than two (2) full work weeks caused by jury duty, or attendance as a witness in a judicial proceeding;
*80 • Absences of less than a full workweek caused by temporary military leave (although Centene may offset against the regular salary any military pay the employee receives);
• Partial day absences for personal reasons or because of sickness or disability;
[ ] Deductions from exempt employee's salaries are permitted in the following circumstances:
• If an exempt employee works less than a full work week in the initial or final week of employment (exempt employees who work less than 40 hours during their first or last week of employment will be paid a proportionate part of their full salary for the time actually worked);
• Absences caused by sickness or disability (including work-related accidents) taken in accordance with the Company's policies which provide paid time off for sickness or disability;
• Full-day absences caused by sickness or disability if the employee is not yet eligible for sick or disability benefits or sick or disability benefits has been exhausted under the Company's other policies providing pay for those absences;
• Hours taken as unpaid leave under the Family and Medical Leave Act (FMLA);
• Full-day absences for personal reasons other than sickness or disability if the employee is not yet eligible for personal time-off benefits or if those benefits have been exhausted;
• Disciplinary suspensions for infractions of safety rules of major significance;
• Disciplinary suspensions of one or more full days for infractions of written workplace conduct rules of the Company including, but not limited to, violations of the Company's Ant-Harassment; Non-Discrimination; Workplace Violence; Drug and Alcohol; Bulletin Boards, Computer, Electronic Mail[.]
Any exempt employee who believes their salary has been subjected to improper deductions should promptly report their concerns to their DSHRP or the Corporate Payroll department. Any improper deductions will be reimbursed, and there will be no retaliation against any employee who raises any good faith concerns regarding deductions from salary. Otherwise, if you have any questions about your paycheck, please contact your DSHRP or the Corporate Payroll department.[16]
Holden's final paycheck reflects that a full day of unpaid time was deducted from her salary because she was out sick and had no sick time left.[17]
*81 B. Holden's Job
The utilization manager job description defines the position's purpose as follows:
Perform duties to authorize and review utilization of mental health and substance abuse services provided in inpatient, outpatient and intermediate care settings, provide and/or review intakes and initial evaluations, brief focused treatment interventions, monitor quality of care, collect and analyze utilization and cost of care data, assist with discharge planning, arrange transportation; provide member assistance and participate in special utilization projects.[18]
It also listed the following duties:
Authorize, direct and monitor care for mental health and substance abuse problems according to clinical information given by providers and internal criteria for medical necessity and appropriateness of care.
Ensure compliance with all performance measures in regards to appeals, denials, higher level of care admission certification and concurrent review timeliness, Outpatient Treatment Report review timeliness, readmissions, and others as indicated.
Interact with physicians and social workers for discharge planning.
Direct and coordinate follow-up to ensure plans for continuity of care and adherence to HEDIS standards.
Compile and report daily review activity and facility statistics.
Participate in quality improvement activities, supporting network development and interfacing with treatment facilities and the professional community.
Verify subscriber eligibility and existing benefits for mental health and substance treatment, prior to authorizing all levels of treatment including concurrent outpatient.
Track benefit usage and advise appropriate parties of exhaustion of benefits. Interact with Medical Director or designee to discuss clinical authorization questions and concerns regarding specific cases.[19]
Pursuant to the job posting to which Holden applied, utilization managers were required to have a master's degree in behavioral health or be a Registered Nurse with more than three years of experience in psychiatric and/or substance abuse health care settings including utilization review.[20] They were also required to have a working knowledge of utilization review procedures, mental health and substance abuse community resources and network providers.[21] Finally, they were required to have an unrestricted license as a Licensed Clinical Social Worker ("LCSW"), Licensed Marriage and Family Therapist ("LMFT"), Licensed Mental Health Counselor ("LMHC"), Licensed Master Social Worker ("LMSW"), License Professional Counselor ("LPC"), or Registered Nurse ("RN") (collectively, the "Clinical Licenses") or hold a PhD or PsyD.[22] Holden does not dispute that these were the stated requirements of the position but disputes that the job duties actually required them.[23]
To maintain the Clinical Licenses, licensees are required to perform continuing *82 education.[24] In addition, each of the Clinical Licenses have the following requirements in Massachusetts:
- LADC1: a master's or doctoral degree in behavioral sciences.[25]
- LMHC: a master's degree with the requisite coursework in mental health counseling or a related field.[26]
- LMFT: either being a clinical member of the American Association for Marriage and Family Therapy or holding either a master's or doctoral degree in marriage and family therapy or related field.[27]
- LCSW: a master's or doctoral degree in social work.[28]
No LPC or LMSW licensure exists in Massachusetts.[29] The requirements to be licensed as an LPC in Connecticut, for example, include holding a master's or doctoral degree in social work, marriage and family therapy, counseling, psychology or a related mental health field.[30] The requirements to be licensed as LMSW in New York, for example, include holding at minimum a master's degree in social work or its equivalent.[31]
Holden disputes that the job description accurately describes the duties of her position. She maintains that her duties "consisted of reviewing provider requests for inpatient services against well-established controls and nationally recognized pre-determined guidelines."[32] Massachusetts providers of Celticare Health Plan would notify Cenpatico by placing a phone call into the call center and request authorization.[33] Once the call was logged into an electronic queue, management would assign cases.[34] Clinical information would be obtained from the facility and inputted into Cenpatico's computer system, at which time it would be applied to either InterQual or ASAM, all of which predetermined whether an authorization would be approved or denied.[35] If the criteria were met, the requests for behavioral health or substance use benefits would be approved; if the criteria were not met, the clinical information was transferred into a physician website and the physician assigned to the case would make the final determination.[36]
Holden avers that, in performing her job duties, she did not assess the member's medical condition or any factors that could influence a determination.[37] In addition, she did not interact with members.[38] Holden used a scripted template to gather the information necessary to input data into *83 InterQual.[39] After inputting the information, InterQual would notify Holden with a box that either said "Criteria Met" or "Criteria Not Met."[40] If InterQual did not approve treatment (Criteria Not Met), Holden would not have the authority to authorize that payment be made.[41] She was then required to send the matter to peer review, where another doctor would make a determination or submit the matter to a supervisor for their handling.[42] After the case had been completed by the physician review, Holden would call the facility and communicate the determination made by the physician.[43]
Holden maintains that she did not, and was not permitted to, use any independent judgment or make any decisions regarding the outcome of authorization requests, instead relying solely on the computer software and Centene's training manuals.[44] The computer system contained certain controls whereby Holden could not create a new authorization if certain conditions were not met.[45] In that scenario, Holden would have to go to a supervisor to unlock the system.[46]
According to Holden, cases were assigned to her each day and she had no discretion to determine the order in which to process facility requests for authorization with the exception of instances when several requests were received from the same facility.[47] Cenpatico's policies and procedures required that Holden work on the oldest cases first.[48] She was prohibited from making clinical decisions around facility requests.[49] Holden was not allowed to deny authorizations or negotiate with facilities on treatment planning or offer a lower level of care.[50] Holden also maintains that management never asked her to provide her clinical opinion or to make recommendations on whether authorizations should be approved or denied.[51] On several occasions, she made recommendations and was reprimanded for doing so.[52]
Holden also maintains that Cenpatico measured her productivity by a quota system.[53] Holden was not allowed to leave work until all of her cases for the day were completed.[54] She was often required to stay past the office's closing time in order *84 to finish all of her assigned cases.[55]
In her own resume, Holden described her duties as utilization manager as follows:
Perform duties to authorize and review utilization of mental health and substance abuse services provided in inpatient, outpatient and intermediate care settings, provide and/or review intakes and initial evaluations, brief focused treatment interventions, monitor quality of care, collect and analyze utilization and cost of care data, assist with discharge planning, arrange transportation; provide member assistance and participate in special utilization projects. Authorize, direct and monitor care for mental health and substance abuse problems according to clinical information given by providers and internal criteria for medical necessity and appropriateness of care. Ensure compliance with all performance measures in regards to appeals, denials, higher level of care admission certification and concurrent review timeliness.[56]
Cenpatico, on the other hand, describes Holden's duties differently. Among other things, Cenpatico alleges that utilization managers would gather detailed medical information about members and have a clinical discussion with the provider.[57] They would then match the information to a set of industry wide standards to verify that the member's symptoms and presentation are appropriate for the level of care being requested by the facility.[58] InterQual was a tool used to support the clinician's medical judgment with a structured evidence-based criteria set.[59]
If the member's symptoms did not meet a particular level of care, utilization managers had the option, based on clinical judgment, to "staff" the case with a supervisor for approval of stay and to make a recommendation as to what should be done and why.[60] Under certain clinical circumstances, utilization managers might determine that it would be appropriate to offer the facility the opportunity of approving a lower level of care for the member, or take other action as needed.[61] Utilization managers may also send the case out for physician advisor review, under which two physicians speak and make a determination whether a member meets criteria for inpatient level of stay.[62] No matter what the decision, the UM must summarize and document the rationale for the decision in the TruCare system.[63]
Holden maintains that Cenpatico evaluated the consistency with which utilization managers applied the criteria for determining whether treatment should be approved through an Inter-Rater Reliability ("IRR") audit.[64] If a utilization manager did not meet IRR standards, she would *85 have to go through retraining.[65] She also maintains that her manager, Ms. Muldoon, performed monthly audits of Holden's reviews.[66] Cenpatico maintains that Ms. Muldoon only audited a small portion of Holden's authorizations, approximately four per month, out of what Holden's claims to be between twenty to thirty authorizations she performed per day.[67]
Holden resigned her position at Cenpatico on October 22, 2015.[68]
II. ANALYSIS
A. Standard Of Review
Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (quotations and citations omitted). A material fact is one which has "the potential to affect the outcome of the suit under the applicable law." Id. (quotations and citations omitted).
The Court "must scrutinize the evidence in the light most agreeable to the non-movants, who are entitled to the benefit of all reasonable inferences therefrom." Ahern v. Shinseki, 629 F.3d 49, 53-54 (1st Cir. 2010) (citing Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004) ). "A properly supported summary judgment motion cannot be defeated by relying upon conclusory allegations, improbable inferences, acrimonious invective, or rank speculation." Id. (citations omitted).
"Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se ." Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996) (internal citations omitted). "Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Id."Where, as here, a district court rules simultaneously on cross-motions for summary judgment, it must view each motion, separately, through this prism." Estate of Hevia v. Portrio Corp., 602 F.3d 34, 40 (1st Cir. 2010) (citing Blackie v. Maine, 75 F.3d 716, 721 (1st Cir. 1996) ("Barring special circumstances, the nisi prius court must consider each motion separately, drawing inferences against each movant in turn.") ).
B. Issues Of Fact Preclude Summary Judgment
As a general matter, employees are entitled to overtime compensation for all hours worked in excess of forty hours in a given week. See 29 U.S.C. § 207. However, certain categories of employees are exempt from overtime pay. As relevant to this case, the FLSA exempts from the overtime pay requirement any employees who work "in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). "The burden is on the employer to prove an exemption from the FLSA's requirements, and the remedial nature of the statute requires that [its] exemptions be narrowly construed against the employers seeking to assert them." Marzuq v. Cadete Enters., Inc., 807 F.3d 431, 438 (1st Cir. 2015) (internal quotations and citations omitted). "How an employee *86 spends his or her time at work is a question of fact, but whether the particular activities subject the employee to an exemption from the FLSA requirements is a question of law." Crowe v. Examworks, Inc., 136 F.Supp.3d 16, 27 (D. Mass. 2015) (citations omitted).
A job title is not determinative of whether an employee is exempt under the FLSA. Cash v. Cycle Craft Co., Inc., 482 F.Supp.2d 133, 136 (D. Mass. 2007), aff'd, 508 F.3d 680 (1st Cir. 2007) (citing 29 C.F.R. § 541.2 ). "Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description." Pippins v. KPMG, LLP, 921 F.Supp.2d 26, 42 (S.D.N.Y. 2012) (citations omitted).
Cenpatico argues that Holden was exempt under the learned professional and the administrative exemptions under the FLSA and Massachusetts law.[69] See Docket No. 36 at 8. For the following reasons, the Court finds that issues of fact preclude the grant of summary judgment in favor of either party.
1. The Learned Professional Exemption
To be considered a professional employee exempt from the overtime requirements, the employee must be compensated on a salary or fee basis at a rate of no less than $455 per week and the employee's primary duty must be work "[r]equiring knowledge of an advanced type in a field of science or learning acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.300. The regulations define "work requiring advance knowledge" as "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." 29 C.F.R. § 541.301(b).
2. The Administrative Exemption
To qualify as an administrative employee, the employee must be compensated on a salary or fee basis at a rate of no less than $455 per week and the employee's primary duty must be "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers," and include "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.
3. Salary Basis
As referenced above, both the learned professional exemption and the administrative exemption require that the employee be compensated on a salary basis at a rate of no less than $455 per week.[70] While Holden does not dispute that she was paid more than $455 per week, she disputes that she was being paid on a salary basis. Docket No. 33 at 5-7; Docket No. 38 at 7-8. An employee is paid on a salary basis "if the employee regularly receives each pay period on a weekly, or less frequent basis, *87 a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a).
A few types of deductions are permitted. Id. at § 541.602(b). As relevant here, "[d]eductions from pay may be made when an exempt employee is absent from work for one or more full days for personal reasons, other than sickness or disability." Id. at § 541.602(b)(1). Deductions may not be made, however, for partial day absences. Id. In addition,
Deductions from pay may be made for absences of one or more full days occasioned by sickness or disability (including work-related accidents) if the deduction is made in accordance with a bona fide plan, policy or practice of providing compensation for loss of salary occasioned by such sickness or disability. The employer is not required to pay any portion of the employee's salary for full-day absences for which the employee receives compensation under the plan, policy or practice. Deductions for such full-day absences also may be made before the employee has qualified under the plan, policy or practice, and after the employee has exhausted the leave allowance thereunder.
Id. at § 541.602(b)(2).
An employee only loses salaried status if the employer has an actual practice of making improper deductions. McGowen v. Four Directions Development Corp., No. 1:12-CV-00109-JAW, 2014 WL 916366, at *13 (D. Me. Mar. 10, 2014) (citing 29 C.F.R. § 541.603(a) ; Cash, 508 F.3d at 683-684 ). In addition:
If an employer has a clearly communicated policy that prohibits the improper pay deductions specified in § 541.602(a) and includes a complaint mechanism, reimburses employees for any improper deductions and makes a good faith commitment to comply in the future, such employer will not lose the exemption for any employees unless the employer willfully violates the policy by continuing to make improper deductions after receiving employee complaints.
29 C.F.R. § 541.603(d).
Holden argues that she was not paid on a salary basis based on Ms. Muldoon's testimony that Cenpatico had a policy of requiring that utilization managers taking partial days off must either make up the missed time or otherwise a deduction would be made from their paycheck. Docket No. 33 at 7; Docket No. 38 at 7. Although Ms. Muldoon did testify that there was a policy of allowing deductions for partial day absences, she also testified that she could not recall any instances where a utilization manager, including Holden, had an improper deduction taken from his or her pay. Cenpatico Dep. at 39-40. Holden has presented no evidence of any such deductions.
In support of her argument that she was not paid on a salary basis, Holden also points to the fact that a one-day deduction was taken from her final paycheck for taking a sick day after her sick leave was exhausted. Docket No. 33 at 7; Docket No. 38 at 7. However, the regulations allow for the deduction of full day absences once sick leave is exhausted. 29 C.F.R. § 541.602(b)(2). In addition, the regulations also allow an employer to pay a proportionate part of the employee's full salary for the time actually worked in the last week of employment. 29 C.F.R. § 541.602(b)(6).
Finally, even if this deduction was improper, Cenpatico's policy prohibiting improper deductions, with a complaint mechanism and reimbursement for employees, *88 preserves the exemption. See 29 C.F.R. § 541.603(d). Holden denies that this policy applied to her but has provided no evidence to dispute Cenpatico's properly supported assertions that the policy applied to her and other utilization managers. See Pl. Reply ¶¶ 2-4.
Accordingly, there are no grounds in the record before the Court on which a reasonable fact finder could conclude that the salary basis requirement was not satisfied with respect to Holden.
4. Exercise Of Discretion And Judgment
Both the learned professional exemption and the administrative exemption also require that the employee's primary duty involve the exercise of discretion and independent judgment with respect to matters of significance. See 29 C.F.R. §§ 541.202(a) ; 541.301(b). "Although the nature of discretion and judgment in the context of the professional exemption does not receive further elaboration in the regulations, the First Circuit has employed the administrative exemption's definition of discretion and independent judgment to the same phrase in the learned professional exemption on at least one occasion." Crowe, 136 F.Supp.3d at 30 (internal citations and quotations omitted). Accordingly, it is appropriate for the Court to rely on the definition of "discretion and judgment" provided for in the administrative exemption recognizing, however, that the Secretary of Labor has noted that the phrase imposes a "less stringent" standard in the context of the learned professional exemption. Id. (citations omitted).
"In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.202(a). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." Id.
Whether an employee exercises "discretion and independent judgment" is fact specific and the Court may consider the following factors:
Whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices; whether the employee carries out major assignments in conducting the operations of the business; whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to the operation of a particular segment of the business; whether the employee has authority to commit the employer in matters that have significant financial impact; whether the employee has authority to waive or deviate from established policies and procedures without prior approval; whether the employee has authority to negotiate and bind the company on significant matters; whether the employee provides consultation or expert advice to management; whether the employee is involved in planning long-or short-term business objectives; whether the employee investigates and resolves matters of significance on behalf of management; and whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances.
29 C.F.R. § 541.202(b). Employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. Id. at § 541.202(c). However, "[t]he exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id. at § 541.202(e).
Based on a review of the evidence before the Court, neither party is entitled to summary *89 judgment on this issue. The parties dispute the duties of the utilization manager and the nature of the job performance required by Holden and other utilization managers. Holden has presented evidence that her job consisted of collecting certain information from medical providers, using a scripted interview, and then inputting that information into a computer system, which would determine whether treatment should be approved.[71] The computer system contained certain controls that she could not override without a supervisor.[72] She maintains that she never spoke to or advised any members, did not assess medical condition, and never monitored care.[73] She did not have discretion to determine even the order in which she would process requests.[74] She also maintains that she was tested for inter-rater reliability, and if she failed, she would have to engage in additional training.[75] A reasonable fact-finder, drawing all inferences in favor of Holden, could conclude that Cenpatico's utilization review process was designed to minimize the amount of discretion and independent judgment employed by Holden and other utilization managers and, therefore, that the professional and administrative exemptions do not apply.
On the other hand, a reasonable fact-finder, drawing all reasonable inferences in favor of Cenpatico, could conclude that Holden in fact exercised discretion and independent judgment in matters of significance. Based on the evidence presented by Cenpatico, such a fact-finder could conclude that Holden and other utilization managers received requests for treatment; independently gathered the necessary information in an interactive process; reviewed medical records applicable to the patient; applied guidelines to the medical information provided to determine whether the guideline was met; and operated with minimal supervision.[76] While Cenpatico acknowledges that Holden used a script to gather information and a computer system in determining whether to approve treatment, a reasonable fact-finder could also conclude that those were merely tools that Holden could use to assist in her determinations.[77]
Cenpatico cites to several decisions where courts found that employees with positions similar to Holden's were exempt as a matter of law. Docket No. 36 at 9-11. Those cases are distinguishable. For example, Cenpatico cites Judge Woodlock's decision in Crowe v. Examworks, Inc., where he found that utilization review nurse auditors ("URNAs") exercised discretion and independent judgment in matters of significance. Crowe, 136 F.Supp.3d at 30-34. Specifically, Judge Woodlock found that there was no dispute that URNAs considered a variety of medical records and circumstances, including a patient's diagnosis, treatment, and prescribed drugs, in comparing the patient's circumstances and the requested treatment to applicable guidelines and operated with minimal supervision. Id. at 30. Judge Woodlock also noted that, although URNAs used guidelines in making their determinations, those guidelines involved highly technical, and complex matters that could only be understood or interpreted by individuals with advanced or specialized knowledge and skills. Id. at 32-33.
Here, by contrast, Holden has presented evidence that she did not consider the *90 patient's medical history in making treatment determinations.[78] Rather, she simply gathered specific information using a script and then entered that information into a computer system, which made a determination that she could not override.[79]
The issue of whether Holden exercised discretion and independent judgment in matters of significance, therefore, simply cannot be decided as a matter of law in this case. Accordingly, the Court will deny both parties' motions for summary judgment.
III. ORDER
For the foregoing reasons, the Court denies the parties' cross-motions for summary judgment.

Def. SOF ¶ 11.

At all times relevant to the actions described in the complaint, Ms. Muldoon was the clinical manager for Cenpatico for Massachusetts and New Hampshire and was Holden's supervisor.

See Rule 30(b)(6) Deposition of Cenpatico (Docket No. 34-2) ("Cenpatico Dep.") at 37-41.

Cenpatico Dep. at 39-40.

Def. Add'l SOF ¶ 5 (emphasis added). Holden disputes that this policy was applicable to Holden but cites to no evidence to contradict Cenpatico's assertion that this policy was applicable to Holden and other utilization managers at Cenpatico. Pl. Reply ¶¶ 2-4. Cenpatico has provided an affidavit from Larissa Sutton, Senior Director of Human Resources at Envolve Health, averring that this policy was applicable to Holden and all other utilization managers during Holden's employment. Affidavit of Larissa Sutton in Opposition to Plaintiff's Motion for Summary Judgment (Docket No. 45-2) ("Sutton Aff.") at ¶ 4. Holden has not cited to any evidence to contradict Ms. Sutton's assertion.

Pl. Resp. ¶ 11; Def. Add'l SOF ¶ 3; Pl. Reply ¶ 3.

Docket No. 37-2 at 125.

Docket No. 37-2 at 125.

Def. SOF ¶ 14.

Def. SOF ¶ 14.

Def. SOF ¶ 14.

Pl. Resp. ¶ 14.

Def. SOF ¶ 15; Pl. Resp. ¶ 15.

Def. SOF ¶ 17; Pl. Resp. ¶ 17.

Def. SOF ¶ 18; Pl. Resp. ¶ 18.

Def. SOF ¶ 19; Pl. Resp. ¶ 19.

Def. SOF ¶ 20; Pl. Resp. ¶ 20.

Def. SOF ¶¶ 21, 22.

Def. SOF ¶ 21. Holden states that she "neither admit[s] nor den[ies]" this statement because it is not relevant. Pl. Resp. ¶ 21.

Def. SOF ¶ 22. Holden states that she "neither admit[s] nor den[ies]" this statement because it is not relevant. Pl. Resp. ¶ 21.

Affidavit of Jennifer M. Holden (Docket No. 39-2) ("Holden Aff.") at ¶ 2.

Holden Aff. at ¶ 4.

Holden Aff. at ¶ 4.

Holden Aff. at ¶5.

Holden Aff. at ¶ 6.

Holden Aff. at ¶ 12.

Holden Aff. at ¶ 16.

Holden Aff. at ¶ 14. Cenpatico admits that Holden gathered the clinical information from the requesting provider via a template of questions. Def. Resp. ¶ 22.

Holden Aff. at ¶ 14.

Holden Aff. at ¶ 15. According to Holden, InterQual was used because it is "objective, measurable and consistent." Holden Aff. at ¶ 14. Holden maintains that InterQual does not allow room for the subjective judgment of utilization managers. Id.

Holden Aff. at ¶ 15.

Holden Aff. at ¶ 10.

Pl. SOF ¶ 27.

Pl. SOF ¶ 27. Cenpatico acknowledges that under certain conditions, the system may not let Holden proceed. Def. Resp. ¶ 27.

Pl. SOF ¶ 27. Cenpatico acknowledges that under certain conditions, a supervisor would be required to allow Holden to proceed. Def. Resp. ¶ 27.

Holden Aff. at ¶ 7.

Holden Aff. at ¶ 7.

Holden Aff. at ¶ 7.

Holden Aff. at ¶ 8.

Holden Aff. at ¶ 8.

Holden Aff. at ¶ 9.

Holden Aff. at ¶ 20.

Holden Aff. at ¶¶ 19-20.

Holden Aff. at ¶ 20.

Def. SOF ¶ 29. Holden testified that she copied and pasted the utilization manager's job description onto her resume as instructed to do so by her manager but maintains that she did not think the job description was accurate. Deposition of Jennifer M. Holden (Docket No. 34-3) ("Holden Dep.") at 37-41.

Def. SOF ¶¶ 37-38.

Def. SOF ¶ 38.

Def. SOF ¶ 39.

Def. SOF ¶ 38; see also Def. SOF ¶ 40; Pl. Resp. ¶ 40.

Def. SOF ¶ 38; see also Def. SOF ¶ 41.

Def. SOF ¶ 38.

Def. SOF ¶ 38.

Pl. SOF ¶ 24; Def. Resp. ¶ 24.

Rule 30(b)(6) Deposition of Cenpatico (Docket No. 34-2) ("Cenpatico Dep.") at 182.

Pl. SOF ¶ 25.

Def. Resp. ¶ 25.

Pl. SOF ¶ 18; Def. Resp. ¶ 18.

The determination of whether an employee is exempt under the learned professional or administrative exemptions is the same under both federal and state law. See 454 C.M.R. 27.03(3) (adopting the federal regulatory scheme defining "bona fide executive, or administrative or professional person").

The salary requirement has since been raised to $913 per week. The parties do not dispute that the amount of $455 per week is pertinent to this case because it was the operative amount during Holden's employment with Cenpatico. See Docket No. 33 at 5, n. 4.

Holden Aff. at ¶¶ 5, 6, 13-15.

Pl. SOF ¶ 27.

Holden Aff. at ¶¶ 12, 16.

Holden Aff. at ¶ 7.

Pl. SOF ¶ 24.

Def. SOF ¶¶ 27-29, 33-44, 50, 52, 70.

Def. Resp. ¶ 27.

Holden Aff. at ¶¶ 5, 6, 12-16.

Holden Aff. at ¶¶ 5, 6, 12-16. Cenpatico argues that the Court should not credit Holden's descriptions of her job duties for purposes of the parties' motions for summary judgment because they contradict prior statements she made regarding her job duties. Docket No. 36 at 12, n. 12 (citing Williams v. Genex Servs., LLC, 809 F.3d 103, 110 (4th Cir. 2015) ). However, the statements to which Cenpatico refers were not made under oath and, therefore, her affidavit is not subject to being stricken under the sham affidavit rule. Whether to credit all, part, or none of Holden's affidavit or her prior statements is for the fact finder.